Argued April 10, writ allowed June 10, 1919.

## OLCOTT, GOVERNOR, *v.* HOFF, STATE TREASURER.

### (181 Pac. 466.)

**Mandamus—Jurisdiction—Original Proceedings in Supreme Court—Scope of Relief.**

1. On an original proceeding in *mandamus* in the Supreme Court, the court will decide all matters of general public interest and importance which the petition asks and which are argued in the briefs, not personal to the petitioner, and which, until decided, will seriously affect and unsettle the administration of the affairs of the state, though a decision as to such matter might be *dicta* as far as the parties involved are concerned.

[As to right to hold two offices at same time, see note in Ann. Cas. 1915A, 525.]

**States—Death of Governor—Succession.**

2. Where the governor of Oregon is removed, dies, resigns or is unable to discharge the duties of his office, the secretary of state becomes governor in fact and is entitled to receive compensation as such, under Article V, Section 8, of the Constitution, notwithstanding Article III, Section 1, Article II, Section 10, of the Constitution, providing, among other things, that no person shall hold more than one lucrative office at the same time.

**Courts—Stare Decisis.**

3. When one of the clauses of the Constitution has been construed by the Supreme Court, that construction should not be set aside except for the most cogent reasons.

Original proceeding in Supreme Court.

In Banc.

This is an original proceeding on a petition for an alternative writ of *mandamus,* in which it is alleged that at the general election on November 5, 1918, James Withycombe was elected governor of the state of Oregon and that he duly qualified for that office on January 14, 1919; that at the general election held on November 7, 1916, the petitioner, Ben W. Olcott, was elected secretary of state of the state of Oregon and that he duly qualified for that office on December 26, 1916; that ever since he "has been and now is the duly

qualified and acting secretary of state," and that on March 3, 1919, James Withycombe, the duly elected and qualified governor of the state, died. Further allegations of the petition follow:

"That under and by virtue of Section 8, Article V, of the constitution of Oregon, the office of governor and the duties thereof devolved upon the secretary of state, and that on the 7th day of March, your petitioner, Ben W. Olcott, took the oath of office and assumed the office and duties of governor; that he has been since that time and now is the governor of the state of Oregon.

"That on April 1, 1919, a warrant was duly issued by the secretary of state in favor of Ben W. Olcott, governor, for the sum of $336.00, in payment of the salary due said Ben W. Olcott, as governor, from March 7th to March 31st (inclusive), 1919, in accordance with law.

"That your petitioner has presented said warrant to O. P. Hoff, state treasurer, and that said O. P. Hoff, state treasurer, has failed and refused and still fails and refuses to pay the same, alleging as his reason that the warrant should be drawn to Ben W. Olcott, secretary of state, acting governor.

"That there is money in the state treasurer's hands to the credit of the fund for the payment of the salary of governor, which money was appropriated by H. B. No. 470, passed at the thirtieth session of the legislature, sufficient to pay petitioner's claim."

Wherefore the petitioner prays:

"That an alternative writ of *mandamus* issue out of this court, returnable on the 8th day of April, 1919, commanding the said O. P. Hoff, state treasurer, to pay said warrant, or on the failure thereof to show this court on the return day, why the same has not been done, and for such other relief as may be proper, and your petitioner particularly prays that this court will define his duties and powers in relation to the office of governor."

To this petition the defendant O. P. Hoff, state treasurer, demurred upon the ground that, "it appears from the face thereof that the writ does not state facts sufficient to constitute a cause of action against this defendant." The case was argued and submitted on April 10, 1919, at which time the court extended a general invitation to the bar of the state to file informal briefs on either side, as a result of which numerous and exhaustive briefs *pro* and *con* were submitted by able and distinguished attorneys, covering a wide range of research and investigation.

On behalf of the petitioner it is vigorously contended that in the interests of the general public, to settle and determine chaotic political and governmental conditions, this court should define his official title and tenure of office and prescribe his duties. The right or province of this court to decide such questions under the record is strenuously denied by opposing briefs. The vital question we are asked to decide is whether the petitioner, Mr. Olcott, holds the office of governor in fact, and if so, for how long, or whether he has the right only to discharge the duties of that office during the remainder of his term as secretary of state. For the purposes of this opinion, all of the allegations of the petition must be deemed taken as true.

WRIT ALLOWED.

For petitioner there was a brief with oral arguments by *Mr. George M. Brown,* Attorney General, and *Mr. J. M. Devers,* Assistant to the Attorney General.

For defendant there was a brief and an oral argument by *Mr. J. G. Richardson.*

As *Amici Curiae,* briefs were submitted on behalf of petitioner by the following attorneys: *Mr. Stephen*

*A. Lowell, Messrs. Carey & Kerr, Mr. Fred W. Mulkey, Messrs. Wood, Montague & Hunt, Mr. Martin L. Pipes, Mr. Charles J. Schnabel* and *Mr. J. G. Arnold.*

As *Amici Curiae,* briefs were submitted on behalf of defendant by the following attorneys: *Mr. Frank S. Grant, Mr. Ralph E. Moody* and *Mr. William H. Holmes.*

JOHNS, J.—Under our form of government all power, both state and federal, is vested in the legislative, executive and judicial departments. Each is separate and distinct from the other. In the affairs of state the governor is the chief executive and all other officers in that branch are more or less subordinate to his position. The office of secretary of state is next in importance. Article III, Section 1, of the Constitution provides:

"The powers of the government shall be divided into three separate departments—the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this constitution expressly provided."

Sections 1 and 8 of Article V follow:

"The chief executive power of the state shall be vested in a governor, who shall hold his office for the term of four years; and no person shall be eligible to such office more than eight in any period of twelve years.

"In case of the removal of the governor from office, or of his death, resignation or inability to discharge the duties of the office, the same shall devolve on the secretary of state; and in case of the removal from office, death, resignation or inability, both of the governor and secretary of state, the president of the

92 Or.—30

senate shall act as governor, until the disability be removed, or a governor be elected.''

The latter article also defines the qualifications of governor and the manner of his election, specifies who are ineligible for the office and names his special powers and duties.

1. In addition to such obligations and responsibilities, it is a matter of common knowledge that the governor is a member of numerous boards before which important business of all state institutions is daily transacted and by which large amounts of bonds are issued and certified for state purposes. This court knows as a matter of law that Mr. Olcott's term of office as secretary of state expires on January 3, 1921, and that if his right to the office of governor or to discharge the duties of that office ends with his term of secretary of state, another governor must be elected at the next general election. These are all matters of general public interest and importance, not personal to Mr. Olcott, and until such time as they are decided will seriously affect and unsettle the administration of the affairs of state. For such reasons, we think it is not only our province but our duty in this kind of a case in a measure to disregard and overlook any of the apparent forms or technicalities which have been suggested, and decide such public questions as are not inconsistent with our judicial duties.

2. Whether Mr. Olcott is governor in fact and holds the office as such for the unexpired term of the late Governor Withycombe, or whether he shall discharge the duties of that office for the remainder of his term as secretary of state, depends upon the legal construction which should be placed upon Article V, Section 8, of the Constitution, above quoted.

As stated by Mr. Justice McBride in *State* v. *Finch,* 54 Or. 482 (103 Pac. 505), our Constitution is largely copied from that of Indiana, which was adopted by that state in 1851 and which provides:

"In case of the removal of the governor from office or of his death, resignation or inability to discharge the duties of the office, the same shall devolve on the lieutenant governor."

By substituting the words "secretary of state" for "lieutenant-governor" that section of the Indiana organic law is made identical with the corresponding section of our own Constitution. Counsel have not cited, and we have not been able to find any decision of the State of Indiana construing that section of its Constitution.

The Federal Constitution, Article II, Section 1, provides:

"In case of the removal of the president from office, or of his death, resignation or inability to discharge the powers and duties of the said office, the same shall devolve on the vice-president."

It will be noted that by inserting the words "powers and" between the words "the" and "duties" and substituting the title "vice-president" for "secretary of state" our own Constitution is made identical with the federal. In so far as we are advised, this particular section of the Federal Constitution has never been construed by any court, yet upon the death of the President no one has ever claimed that the Vice-president became Acting President only, or that he would not succeed to the office of president itself for the remainder of the unexpired term for which the President was elected.

We have examined the Constitutions of every state in the Union and none of them are identical with our

own, the closest resemblance being found in the Indiana and Federal Constitutions as above noted.

Under their respective Constitutions, in the event of the death of the governor, the powers and duties of that office devolve upon the lieutenant-governor in the following states:

| | |
|---|---|
| Alabama | Nebraska |
| California | Nevada |
| Colorado | New Mexico |
| Connecticut | New York |
| Delaware | North Carolina |
| Idaho | North Dakota |
| Illinois | Ohio |
| Indiana | Oklahoma |
| Iowa | Pennsylvania |
| Kentucky | Rhode Island |
| Louisiana | South Dakota |
| Massachusetts | Texas |
| Michigan | Vermont |
| Minnesota | Virginia |
| Mississippi | Washington |
| Missouri | Wisconsin |
| Montana | |

and under like condition such duties devolve upon the President or Speaker of the Senate in the following named states:

| | |
|---|---|
| Arkansas | Maryland |
| Florida | New Hampshire |
| Georgia | New Jersey |
| Kansas | Tennessee |
| Maine | West Virginia. |

It is only in Oregon, Arizona, Utah and Wyoming that in the event of the governor's death the secretary of state succeeds to his office or performs his duties. Excluding Oregon, the Constitutions of Alabama,

Delaware, New Mexico, Oklahoma, South Carolina and Virginia only, expressly provide that upon the death of the governor the office of governor itself shall devolve upon his designated successor; and we have not been cited to, or able to find any decision by the courts of either of those states construing that particular section of their respective Constitutions.

The only decision of this court on the subject was rendered in the case of *Chadwick* v. *Earhart,* 11 Or. 389 (4 Pac. 1180), which is vigorously assailed by counsel here, who claim that it was largely *dictum,* is not the law and should be overruled. That case was decided at the October term, 1884, and it appears from the brief of the respondent R. P. Earhart, who was then the secretary of state, that:

"The statement of facts contained in the stipulation which is the basis of this action may be briefly stated by submitting the questions. In the event of the resignation of the governor of Oregon does the secretary of state become the governor by operation of law, and is he entitled to the salary provided by law for that office? * * A nice question is raised by the stipulation, but it is of no importance in ascertaining whether appellant is entitled to the salary in question, that is, was the appellant the governor during the two days after the qualification of the respondent and before the qualification of Governor Thayer? And further, as the secretary of state is governor or acting governor, as the case may be, the office or duties thereof devolved on the respondent during that time. And we maintain that the title to each office terminated with the expiration of the four years after his qualification."

Among other things, it was stipulated that:

"Mr. Earhart objects to the salary being paid from the 9th day of September, 1878, to the 11th day of September, 1878—two days—on the ground that Mr. Chadwick was not secretary of state after Mr. Ear-

hart was sworn in on the 9th day of September, 1878, though Mr. Chadwick acted as governor until and including the 11th day of September, 1878.''

The attorney for Mr. Chadwick, the appellant, made the following contention in his brief:

''In the event of the happening of any one of the above contingencies the office of governor devolves upon the secretary of state. The language in reference to the duties of secretary of state in this event is the same as that defining the office of President when the Vice President succeeds to the same, except the word 'powers' is omitted.

''The office of governor is distinctive. It cannot merge into another. It cannot be vacant any more than can be the President's office. The appointments under a constitution cannot be broken, whether they are made by an election or otherwise. The office is always filled. The incumbent is an incident to the office. Whether the incumbent is at the time secretary of state, he is the governor, and as much as if his appointment had been made by an election. *The office devolves on him.* The means used to fill the office of governor are absolute, and while they may be different according to contingencies, the one act of filling the office makes the incumbent governor. It is the office, not the man. Under a constitution there can be no such thing as an 'acting officer.' That is one that appears to be what he is not. No more than a clerk of a department could discharge the duties of President.

''There can be but one construction of the constitution in reference to this matter, and that is that the office shall devolve on the secretary of state. Duties are subordinate to the office and a part of it, and when the office devolves on the secretary of state, duties follow—*prescribed, or to be prescribed, by legislative enactment*: 1 Kent Com. 279.''

It was on such stipulation of facts and the briefs of respective counsel that the decision was rendered,

wherein this court through Mr. Chief Justice WALDO said:

"Two questions are submitted in this case. The first and principal one is, whether, when, under section 8 of Article V of the constitution of Oregon, the duties of the office of governor devolve upon the secretary of state, he has a right to the salary of the office. Second. If this question be answered in the affirmative, whether he shall continue to perform the duties of the office for the remainder of the term of the outgoing governor, or shall he perform those duties only so long as he shall continue to be secretary of state. * *

"Counsel for the respondent claims that in the contingency provided for in said section 8, the duties of the office of governor become annexed to the office of secretary of state, and are discharged as duties incident to the latter office. In other words, that the duties of the office, but not the office itself, devolve upon the secretary of state.

"This position seems to require: First. Either that the office of governor should continue vacant during the time the secretary discharges its duties, and that such duties be in some way performed by the secretary of state, as such, consistently with a condition of vacancy; 'or, Second. That the office be filled and yet he who fills it be in nowise governor, but continue to be merely secretary of state.

"In the first place, it is not shown how an office can be vacant and yet there be a person, not the deputy, or *locum tenens,* of another, empowered by law to discharge the duties of the office and who does in fact discharge them. It is not explained how, in such a case, the duties can be separated from the office, so that he who discharges them does not become an incumbent of the office. And, in the second place, how a person can fill the office of governor without being governor.

"It is the function of a public officer to discharge public duties. Such duties constitute his office. Hence, given, a public office and one who, duly empowered, discharges its duties, and we have an incumbent in

that office. Such is the case here. The secretary of state, by force of the function cast upon him, becomes governor, and consequently entitled to the salary appertaining to the office.

"Nor does the language of the section, grammatically considered, bear the interpretation counsel has put upon it. Leaving out the co-ordinate clauses following the first clause, and the sentence reads: 'In case of the removal of the governor from office, the same shall devolve on the secretary of state'; that is, the office shall devolve. So, taken with each of the succeeding clauses, the word 'same' stands for 'office.' "

As to the second question, the opinion holds that the individual

" * * answering the description at the time the contingency arises designates him as the person who is to enter and fill the office, and when, as thus designated, he enters into the office, he holds it in his natural, and not in his official capacity. This seems to be the principle which applies when the office of governor devolves on the secretary of state on the happening of any of the events specified in the constitution. * * Now, as two offices may remain distinct, which are not incompatible though the officer is the same person, it would seem that the same principle should govern the holding of the office of governor by the secretary of state.

"This question, therefore, must also be answered in favor of the appellant, and judgment be entered accordingly."

We do not agree with the statement of counsel that other courts have refused "to accept the Chadwick case as sound law." Upon that particular point, no United States court has ever construed the Federal Constitution and no state court has ever rendered any decision construing the same, or a similar provision of a state Constitution.

To support the argument that Mr. Olcott does not hold the office and is acting governor only, *amicus curiae,* counsel for defendant, cites and relies upon the following authorities: *State* v. *Grant,* 12 Wyo. 1 (73 Pac. 470, 2 Ann. Cas. 382); *State* v. *Saddler,* 23 Nev. 357 (47 Pac. 450); *Clifford* v. *Heller,* 63 N. J. Law, 105 (42 Atl. 155, 57 L. R. A. 312); *People* v. *Budd,* 114 Cal. 168 (45 Pac. 1060, 34 L. R. A. 46); *People* v. *Cornforth,* 34 Colo. 107 (81 Pac. 871); *Opinion of the Justices,* 70 Me. 570; *State* v. *Stearns,* 72 Minn. 200 (75 N. W. 210); *State* v. *McBride,* 29 Wash. 335 (70 Pac. 26); *Futrell* v. *Oldham,* 107 Ark. 386 (155 S. W. 502, Ann. Cas. 1915A, 571). Those decisions were rendered under the respective Constitutions of the different states, which provide as follows:

"If the governor be impeached, displaced, resign or die, or from mental or physical disease or otherwise, become incapable of performing the duties of his office or be absent from the state, the secretary of state shall act as governor until the vacancy is filled or the disability removed": Wyoming, Art. IV, § 6.

"In case of the impeachment of the governor or his removal from office, death, inability to discharge the duties of the said office, resignation or absence from the state, the powers and duties of the office shall devolve upon the lieutenant governor for the residue of the term or until the disability shall cease": Nevada, Art. V, § 18.

"In case of the death, resignation or removal from office of the governor, the powers, duties and emoluments of the office shall devolve upon the president of the senate": New Jersey, Art. V, § 12.

"In case of the impeachment of the governor or his removal from office, death, inability to discharge the powers and duties of his office, resignation or absence from the state, the powers and duties of the office shall devolve upon the lieutenant governor for the residue

of the term or until the disability shall cease": California, Art. V, § 16.

"In case of the death, impeachment or conviction of felony or infamous misdemeanor, failure to qualify, resignation, absence from the state or other disability of the governor, the powers, duties and emoluments of the office for the residue of the term or until the disability be removed, shall devolve upon the lieutenant governor": Colorado, Art. IV, § 13.

"Whenever the office of the governor shall become vacant by death, resignation, removal from office or otherwise, the president of the senate shall exercise the office of governor until another governor shall be duly qualified": Maine, Art. V, § 14.

"The lieutenant governor shall be *ex-officio* president of the senate; and in case a vacancy shall occur, from any cause whatever, in the office of governor, he shall be governor during such vacancy": Minnesota, Art. V, § 6.

"In case of the removal, resignation, death or disability of the governor, the duties of the office shall devolve upon the lieutenant governor": Washington, Art. III, § 10.

"In case of the death, conviction or impeachment, failure to qualify, resignation, absence from the state, or other disability of the governor, the powers, duties and emoluments of the office for the remainder of the term or until the disability be removed or a governor elected and qualified, shall devolve upon and accrue to the president of the senate": Arkansas, Art. VI, § 12.

It will be noted that in all of the sections quoted it is not the office, but the powers and duties of the office, which devolve upon his successor in the event of the death of the governor. The importance of that distinction is clearly pointed out by the recent decision of the Supreme Court of Arkansas in construing the Constitution of that state in the case of *Futrell* v. *Old-*

*ham,* 107 Ark. 386 (155 S. W. 502, Ann. Cas. 1915A, 571), where the opinion says:

"If the framers of the constitution had intended to provide for the devolution of the office of governor, in case of vacancy by resignation or otherwise, upon the president of the senate, that intention could easily have been directly expressed in appropriate words. But they chose other terms which clearly observe the distinction between the course of succession of the office itself and a mere devolution of the duties and the emoluments of the office for the time being, and deliberately adopted the latter as the best means of having the government administered until the people themselves can elect a governor."

That distinction was also made and emphasized by this court in the case of *Chadwick* v. *Earhart,* 11 Or. 389 (4 Pac. 1180).

W. H. Holmes, who submitted an *amicus curiae* brief in the instant case, was also one of counsel for the respondent Earhart in the Chadwick case and then contended that "the right of the appellant to the salary would depend on whether the title of the office of governor was vested in him or not"; that the title to that office was not vested in Chadwick and that his term as governor was special, "and the time cannot be extended by implication." In his brief in the pending case he frankly says:

"If the Chadwick case was correct law, it would seem the question has already been determined judicially and there would be nothing for the attorney general to do except to state that the question has been decided by the court of last resort in the state of Oregon and that the secretary of state would be justified in following the decision. Owing to the refusal of other courts in the land to accept the Chadwick case as sound law, and inasmuch as the secretary of state wants his rights and duties defined in regard to resigning his

office as secretary of state, with the view of assuming the office of governor and appointing a person to the office which he proposes to resign, it is important that the question now before the court be correctly decided."

Then, as now, he vigorously asserted that it was not the law and should be overruled.

Much stress is laid upon the fact that R. P. Boise was a member of the constitutional convention and that as circuit judge he sustained the demurrer to the complaint in the Chadwick case. We have a very high regard and a profound respect for his judicial learning and ability, but his decision was rendered under the old practice and upon an agreed statement of facts, with a view of prosecuting an appeal and obtaining an early decision in the appellate court. Outside of the fact that Judge Boise sustained the demurrer, there is no written evidence in this or the Circuit Court as to what may have been his personal opinion or reason for sustaining the demurrer. The fact remains that the Chadwick case was decided by this court in October, 1884; that the opinion of the then judges of this court, WILLIAM P. LORD, W. W. THAYER and J. P. WALDO, Chief Justice, was unanimous and that for more than thirty-four years it has never been questioned in this court.

Counsel now attack the grammatical construction given to that section of the Constitution in the opinion, contending that the word "same" as used therein refers to the word "duties" and not to "office," and that it should be construed to mean that in case of the removal of the governor or of his death, resignation or inability to discharge the duties of his office, the duties of the office, and not the office itself should devolve upon the secretary of state. That question was

squarely decided in the Chadwick case and its decision was necessary to the opinion. It was there contended that Chadwick knew of the terms and provisions of that section of the Constitution when he was elected and qualified as secretary of state; that because he was secretary of state he might be called upon to perform the duties of the office of governor and for such reason he was not entitled to receive any compensation for his services in that capacity, and that even though he performed the duties of governor he should receive only his salary as secretary of state. In deciding that point the court held that the word "same" relates to and qualifies the word "office" and in legal effect that the section should read:

"In case of the removal of the governor from office or of his death, resignation or inability to discharge the duties of the office, the office itself shall devolve upon the secretary of state."

Article II, Section 7, of the organic law of Oregon adopted in 1845, provides that:

"The governor shall continue in office two years, and until his successor is duly elected and qualified; and in case of the office becoming vacant by death, resignation or otherwise, the secretary shall exercise the duties of the office until the vacancy be filled by election."

Volume 9 of United States Statutes at Large, page 324, Act Aug. 14, 1848, c. 177, Section 3, establishing the territory of Oregon, provides:

"And in case of death, removal, resignation or absence of the governor from the territory, the secretary shall be, and he is hereby authorized * * to perform all the powers and duties of the governor, during such vacancy or absence, or until another governor shall duly be appointed and qualified to fill such vacancy."

Our present Constitution was adopted on November 9, 1857, and its framers must have known of such terms and provisions of the organic law and territorial statutes, both of which specify that in the event of the death of the governor the secretary of state shall exercise and perform the duties of that office; that under the organic law he should perform those duties "until the vacancy be filled by election," and that under the territorial statute he should perform those duties "during such vacancy or absence, or until another governor shall duly be appointed and qualified to fill such vacancy." Yet with such knowledge it is significant that the Constitution which they adopted provides that:

"In case of the removal of the governor from office, or of his death, resignation or inability to discharge the duties of the office, the same shall devolve on the secretary of state."

They did not select either, but drafted and adopted another section, using language of their own, with a different meaning. That section further says:

"In case of the removal from office, death, resignation or inability, both of the governor and the secretary of state, the president of the senate shall act as governor until the disability be removed or a governor elected."

And it is contended that because in such a case "the President of the Senate shall act as governor," it must follow that the section should be construed to mean that upon the death of the governor the secretary of state should "act as governor." We do not think that it will bear that construction. It specifically says that:

"In case of the removal of the governor from office, or of his death, resignation or inability to discharge

the duties of the office, the same shall devolve on the secretary of state''

—and that in the event of the death or disability of both the governor and the secretary of state the president of the senate shall act as governor. It does not say that the secretary of state shall act as governor, although it says that the president of the senate shall ''act as governor.'' If it had been the intent of the framers of the Constitution that the secretary of state should ''act as governor,'' it would have been an easy matter to say so and to apply the same language to the secretary of state that it did to the president of the senate.

3. Upon the question of *stare decisis* the Supreme Court of Washington in *In re City of Seattle,* 62 Wash. 218 (113 Pac. 762), says:

''The rule of *stare decisis* is peculiarly applicable to the construction of the constitution. The interpretation of that document should not be made dependent upon every change in the personnel of the court. When one of its clauses has been construed, that construction should not be set aside except for the most cogent reasons. Certainty in the law is of the first importance.''

In Cooley's Constitutional Limitations (7 ed.), page 83, it is said:

''Precedents, therefore,' become important, and counsel are allowed and expected to call the attention of the court to them, not as concluding controversies, but as guides to the judicial mind. Chancellor Kent says: 'A solemn decision upon a point of law arising in any given case becomes an authority in a like case, because it is the highest evidence which we can have of the law applicable to the subject, and the judges are bound to follow that decision so long as it stands unreversed, unless it can be shown that the law was mis-

understood or misapplied in that particular case. If a decision has been made upon solemn argument and mature deliberation, the presumption is in favor of its correctness and the community has a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it. It would therefore be extremely inconvenient to the public if precedents were not duly regarded and implicitly followed. It is by the notoriety and stability of such rules that professional men can give safe advice to those who consult them, and people in general can venture to buy and trust, and to deal with each other. If judicial decisions were to be lightly disregarded, we should disturb and unsettle the great landmarks of property. When a rule has once been deliberately adopted and declared, it ought not to be disturbed unless by a court of appeal or review, and never by the same court, except for very urgent reasons, and upon a clear manifestation of error; and if the practice were otherwise, it would be leaving us in a perplexing uncertainty as to the law.' "

This rule of construction has been adopted and followed by a long line of decisions of this court, commencing with the case of *State* v. *Clark,* 9 Or. 470, and ending with the case of *Multnomah County* v. *United States Fidelity & Guaranty Co.,* 92 Or. 146 (180 Pac. 104), decided April 22, 1919. The rule is well stated by Mr. Justice BURNETT in his dissenting opinion in *Kalich* v. *Knapp,* 73 Or. 587 (145 Pac. 27, Ann. Cas. 1916E, 1051), thus:

"Another doctrine equally well settled is that of *stare decisis,* to the effect that, when a decision has once been rendered, it amounts to an authoritative construction of the law, and should not be disregarded or overturned, except for very cogent reasons showing beyond question that on principle it was wrongly decided. The principle is that laws are largely conventional rules of action, and it is more important that the rule be settled as a guiding precept to the public than that by the action of the courts the law should

be made to fluctuate like the tides.'' (Citing authorities.)

Article II, Section 10, of the Constitution provides that:

'' * * Nor shall any person hold more than one lucrative office at the same time, except as in this constitution expressly permitted.''

It is contended that under Article III, Section 1, *supra,* and the section just quoted no one individual can receive the emoluments and hold the offices of governor and secretary of state at the same time, but it will be noted that each of such sections contains the clause, ''except as in this Constitution expressly permitted,'' and that the offices of governor and secretary of state are both executive or administrative, and not legislative or judicial. All of the Constitution was adopted at the same time and its various provisions must be construed as a whole, and when Article II, Section 10, and Article III, Section 1, are considered with Article V, Section 8, they are not in conflict. The devolving of the office of governor, at the death of that official, upon the secretary of state is one of the exceptions contemplated by the framers of the Constitution, provided for by Article II, Section 10, and Article III, Section 1. The word ''devolve'' has a legal meaning and is well defined by Bouvier thus: ''To pass from a person dying to a person living.''

Regardless of the question as to whether the Chadwick case is sustained by the weight of authority, the fact remains that since its decision in October, 1884, many legislatures have come and gone; that the people have directly or indirectly had the power to amend the Constitution; that for more than thirty-four years it has been the law of the state and that it was decided

92 Or.—31

by eminent justices of this court and is sustained by such reasoning and authority as clearly to bring it within the rule of *stare decisis* and make it binding on this court.

Mr. Olcott is governor in fact and has the right and title to the office itself, with the accompanying right and authority to perform the duties and receive the emoluments of the office. As to whether he could resign as secretary of state, and as governor appoint another to that position and still continue to hold the office of governor, we do not feel legally justified in going beyond anything said in this opinion. That is less a public and more a personal question for Mr. Olcott.

But we do hold that upon the death of the late Governor Withycombe, by reason of the fact that Mr. Olcott was then secretary of state he automatically became governor, and when he took the oath as such the office of governor and the title to that office were thrust upon him by the terms and provisions of Article V, Section 8, of the Constitution, and that under the authority of *Chadwick* v. *Earhart,* 11 Or. 389 (4 Pac. 1180), he became and is now governor in fact and is entitled to hold that office, perform all of its duties and receive its emoluments for the full period of the unexpired term to which the late Governor Withycombe was elected. This decision is based upon the express terms and provisions of our state Constitution which was adopted by a direct vote of the people and which within itself, in case of the removal of the governor from office, or of his death, etc., provides how and by whom the office of governor shall be filled; and for such reason it is not in conflict with the recent opinion of the majority of this court in *State ex rel.* v. *Kellaher,* 90 Or. 538 (177 Pac. 944). In that kind of

a case there is a vacancy and the law provides for an appointment to fill the same and states by whom the appointment shall be made. In the instant case, however, when the people elected Mr. Olcott secretary of state, by the very terms of the Constitution they elected him to become governor upon the death of Governor Withycombe. There was no vacancy in that office, as the people, speaking through the Constitution, have made their own selection.

The court sincerely thanks distinguished counsel for their able and instructive briefs as *amici curiae* on the respective sides and assures them that the same are duly appreciated.

Let the writ issue as prayed for in the petition.

WRIT ALLOWED.

MR. JUSTICE BEAN concurs.

McBRIDE, C. J., Specially Concurring.—I fully concur with the reasoning of Justice JOHNS, and in the conclusion arrived at by him, but think we should go further and decide every question that is presented in the briefs.

In the specially concurring opinions of Justices BURNETT and BENNETT, it is urged that the question, as to whether the petitioner will hold for the remainder of the unexpired term of the late Governor Withycombe, or only until his own term as secretary of state expires; and the further question, as to whether Mr. Olcott can now resign the office of secretary of state and continue to hold the office of governor, are not necessarily involved here, and that any discussion of these questions is academic, and any opinion rendered in respect to them, would be merely *dictum.*

If these questions involved merely the private rights of individuals this contention would undoubtedly be correct; but where the general public has an interest

in the controversy the courts have, with substantial unanimity, disregarded the technical limitations embraced in the term *"dictum"* and decided the whole controversy where such a course appeared promotive of the public good, or calculated to settle disputed construction of provisions of the Constitution and prevent future litigation concerning them. I do not now refer to or cite the decisions from those states where the law provides for the submission of such questions to the Supreme Court without suit, but to those having Constitutions no broader in these respects than our own and to the Supreme Court of the United States: *Giles v. Harris*, 189 U. S. 475 (47 L. Ed. 909, 23 Sup. Ct. Rep. 639) ; *Memphis St. Ry. Co. v. Rapid Transit Co.*, 133 Tenn. 99 (179 S. W. 635, Ann. Cas. 1917C, 1045, L. R. A. 1916B, 1147) ; *Boise City Irr. & Land Co. v. Clark*, 131 Fed. 415 (65 C. C. A. 399) ; *Borgnis v. Falk Co.*, 147 Wis. 327 (133 N. W. 209, 37 L. R. A. (N. S.) 489) ; *State v. Stutsman*, 24 N. D. 68 (139 N. W. 83, Ann. Cas. 1914D, 776) ; *State v. Southern Tel. & Cons. Co.*, 65 Fla. 67 (61 South. 119) ; *Commonwealth of Massachusetts v. Klaus*, 145 App. Div. 798 (130 N. Y. Supp. 713) ; *In re Fairchild*, 151 N. Y. 361 (45 N. E. 943) ; *People v. General Committee of Republican Party*, 25 App. Div. 339 (49 N. Y. Supp. 723) ; *In re Morgan*, 114 App. Div. 45 (99 N. Y. Supp. 775).

In *Giles v. Harris*, 189 U. S. 475 (47 L. Ed. 909, 23 Sup. Ct. Rep. 639), the United States Supreme Court says:

"Perhaps it should be added to the foregoing statement that the bill was filed in September, 1902, and alleged the plaintiff's desire to vote at an election coming off in November. This election has gone by, so that it is impossible to give specific relief with regard to that. But we are not prepared to dismiss the bill or the appeal on that ground, because to be enabled

to cast a vote in that election is not, as in *Mills* v.
*Green,* 159 U. S. 651, 657 (40 L. Ed. 293, 16 Sup. Ct.
Rep. 132), the whole object of the bill. It is not even
the principal object of relief sought by the plaintiff.
The principal object of that is to obtain the perma-
nent advantages of registration as of a date before
1903. * *

"The traditional limits of proceedings in equity
have not embraced a remedy for political wrongs. * *
But we cannot forget that we are dealing with a new
and extraordinary situation, and we are unwilling to
stop short of the final considerations which seem to us
to dispose of the case": *Giles* v. *Harris,* 189 U. S. 475,
484, 486 (47 L. Ed. 909, 23 Sup. Ct. Rep. 639, 641, 642).

In *Memphis St. Ry. Co.* v. *Rapid Transit Co.,* 133
Tenn. 99 (179 S. W. 635, Ann. Cas. 1917C, 1045,
L. R. A. 1916B, 1147), the Supreme Court of Tennes-
see says:

"We have formerly held that when any question in-
volving the constitutionality of an Act of the Legis-
lature is *bona fide* made and relied upon in a case, this
Court should take appellate jurisdiction of such a
case. * * Although we appreciate the delicacy of pass-
ing on the validity of an Act of the Legislature, such
a duty is often imposed upon us and we must not
dodge our jurisdiction. Where an Act of the Legis-
lature undertakes to regulate a particular subject and
the application of such an act is invoked by one party
in a suit involving that subject and the validity of the
Act is questioned by the other party, we think it proper
that the statute should be tested."

In *State* v. *Southern Tel. & Constr. Co.,* 65 Fla. 67
(61 South. 119), the Supreme Court of Florida says:

"The Railroad Commissioners, acting for the state,
are the relators and plaintiffs in error, and the fact
that the person in whose favor the order is sought to
be enforced has moved away does not show that under
no circumstances can the writ be made effective for
the purpose designed in this case. And even if under

no circumstances the writ could be made effective because of Mr. Chaires' removal, the appellate court does not thereby lose jurisdiction of the cause, and it may be retained for the determination of questions properly presented involving the duties and authority of state officials that are of general interest to the public. * *

"The respondent's motion to quash the alternative writ presents questions of law that affect the authority and duties of the Railroad Commissioners in regulating the service rendered by telephone companies, and the public as well as the relators is interested in having the legal questions raised determined for the future guidance of the state officials. * * "

In *Commonwealth of Massachusetts* v. *Klaus,* 145 App. Div. 798 (130 N. Y. Supp. 713), the court says:

"This is an appeal from an order of a justice * * denying a motion to issue a subpoena requiring Rembrandt Peale, a person within the state, to appear and testify in a criminal action pending in the state of Mass. * * By the subpoena applied for, it was sought to procure the attendance of Peale in Mass. in Sept., 1910, and it may be that the criminal prosecution has already ended, so that his attendance would now be useless.

"On this point the papers on appeal do not advise us, but even if such were the case we should deem it our duty to examine the question of the validity of the act because the special term decision already referred to will, unless overruled, probably serve to render the act nugatory. Appellate courts not infrequently pass upon questions affecting public interests, even where in the particular case the question has become academic."

*In re Fairchild,* 151 N. Y. 361 (45 N. E. 943), the Court of Appeals of New York says:

"The respondent contends that, inasmuch as the election has been held, the decision of the questions presented on this appeal is of no importance, as it can,

at most, only affect the questions of costs.  We think
the questions involved are of sufficient importance to
require their determination by this court, as it may
prevent future embarrassment in the congressional
district to which the controversy relates, and also
settle other questions upon which there is a conflict
in the decisions of the supreme court. * * ''

In *People* v. *General Committee, etc.,* 25 App. Div.
339 (49 N. Y. Supp. 723), the same court says:

"This court held *In re Cuddeback,* 3 App. Div. 103
(39 N. Y. Supp. 388), viz.:

" 'An appeal will not always be dismissed because
the question is no longer a practical one.  Notwith-
standing the fact that an election has been held, and
a decision of the question involved cannot affect the
result of that election, yet, where the point at issue
is one of public interest, affecting the rights of all the
electors of the state, the courts will determine it.'

"Following the doctrine there laid down, it seems
that we ought not, in this case, to dismiss the appeal,
because the question here involved is as much a matter
of public interest as the question involved in the case
from which the quotation has been made. * * ''

And *In re Morgan,* 114 App. Div. 45 (99 N. Y. Supp.
775), the same court says:

" * * The sole question involved in this appeal is
the constitutionality of said amendment, and, although
the said election has long since passed, and therefore
our decision can have no effect upon the rights of the
appellant at said election, both sides urge a considera-
tion by this court of a public question vitally affecting
the conduct of elections in the future.  Although in
one sense academic, such considerations have moved
both this court * * and the Court of Appeals * * to
consider and determine cases involving the election
laws, although the immediate necessity therefor has
passed away. * * ''

This phase of the matter here under discussion did
not escape the astute mind of Bouvier, who observes:

"So also it has been held, with respect to a court of last resort, that all that is needed to render its decision authoritative is that there was an application of the judicial mind to the precise question adjudged; and that the point was investigated with care and considered in its fullest extent (*Alexander* v. *Worthington et al.*), 5 Md. 488; and that when a question of general interest is involved, and is fully discussed and submitted by counsel, and the court decides the question with a view to settle the law, the decision cannot be considered a *dictum.* (Id.)"

In the present case it cannot be successfully argued that the public has not a profound interest in the speedy solution of the questions submitted. There can be little question that Mr. Olcott is entitled to hold both the office of governor and secretary of state, and to draw the salaries of both. It is creditable to him that he does not wish to do the first and will not do the second. In the infancy of the state, when its business was insignificant and its revenues small, one person could well perform the duties of both governor and secretary of state, but with the enormous expansion of state business each of the three constitutional officers finds in his own department all the business which he can attend to, and more.

Questions, involving the care and expenditure of vast sums of money and affecting large social and economic interests, continually present themselves before the various boards, of which these officers are members. The object of having a board, composed of these officers, was to have the advantage of the opinions of three minds and the independent research of three persons before conclusions, vital in the administration of the state's fiscal affairs, were arrived at. Where the offices of governor and secretary of state are merged in one individual, the public loses the safe-

guard that was intended by the Constitution when it provided that certain boards should consist of three officers, namely, the governor, secretary and treasurer. If it is possible for Mr. Olcott to give up the office of secretary of state and retain the office of governor, he should be permitted to do so, in the public interest, and we ought not to quibble about *"dicta"* in so declaring.

The public also has an interest in having the duration of his term of office settled. If a new governor is to be chosen at the next general election, the voters of the state should be apprised of that fact, so they may look about and weigh the qualifications of the various candidates, or prospective candidates, with a view to enabling themselves to choose intelligently. With the question undecided, and perhaps a large majority of the voters under the impression that Mr. Olcott's term will not expire at the next general election, the primary election for that office will be clouded with uncertainties not conducive to intelligent selection.

It is true that each of these questions could be presented later by two or more additional lawsuits; that to use a homely simile, we could "cut the dog's tail off by inches" instead of by making one slash and finishing the business once for all.

It is true the progress by inches would furnish business for attorneys and capital for petty politicians, but it would not promote the interest of the public, which, as before shown, is to have these questions settled now.

I consider every question discussed in the various briefs absolutely settled by the case of *Chadwick v. Earhart*, 11 Or. 389 (4 Pac. 1180), cited in the principal opinion. Justice WALDO, who delivered the opin-

ion in that case, was not only a lawyer of great learning but notably accurate in his choice of language, and the language used by him seems to me to bear no other construction than that when the secretary of state becomes governor, he becomes such in his natural not official capacity; just as the Vice-president, on the death of the President, succeeds to the office for the remainder of the term. Such was the interpretation put upon that opinion by Justice LORD, who was one of his associates and who concurred in the opinion. After Justice LORD's retirement from the Bench, he was selected as a commissioner to revise the Oregon laws and produced the compilation which now bears his name.

His annotation to Article V, Section 8, of the Constitution, is as follows, citing *Chadwick* v. *Earhart,* 11 Or. 389 (4 Pac. 1180):

"Under this provision when the governor resigns, the duties of the governor's office devolve upon the secretary of state, who continues to perform them for the remainder of the term."

If the language of the opinion were even obscure, which it is not, this interpretation by one of the learned justices, who participated in its rendition, ought to settle the question as to what the court meant to decide.

I do not consider the cases of *State* v. *Johns,* 3 Or. 533, *State* v. *Ware,* 13 Or. 380 (10 Pac. 885), *State* v. *Kellaher,* 90 Or. 538 (177 Pac. 944), in point in the present controversy. They were decided upon the theory that where a vacancy in an elective office is filled by appointment, the people should have the right to elect a successor at the earliest opportunity. Such is not the case here. Mr. Olcott was not appointed to the office of governor. He succeeded to it by virtue of

his election to the office of secretary of state, just as the Vice-president of the United States, upon the death of the President, succeeds to that office. The people, when they elected him secretary of state, had notice, by the very terms of the Constitution, that in case the governor should die he would succeed to the office of governor; they chose him with that contingency in view. In effect, in choosing a secretary of state, they chose a vice-governor, the rules of whose succession to the office are in no wise different from those investing the Vice-president, except that while the governor lives the secretary performs the duties relating to the secretaryship, while the Vice-president—during the life of the President—performs the duties of President of the senate. In both instances the original source of their authority is an election by the people and not, as in the case of *State* v. *Johns,* 3 Or. 533, an appointment by the executive.

For the reasons given by Justice JOHNS, as well as those urged herein, I am of the opinion that this court should declare the petitioner is governor in fact and not acting governor; that he is entitled to the salary of governor; that he holds the office for the remainder of the term of the late Governor Withycombe, and that he may resign the office of secretary of state and still hold the office of governor.

HARRIS, J., Concurring in Part.—On April 1, 1919, a warrant was issued by the secretary of state in favor of "Ben W. Olcott, governor, for the sum of $336 in payment of the salary due said Ben W. Olcott, as governor, from March 7 to March 31, 1919." The state treasurer contends that the warrant "should be drawn to Ben W. Olcott, secretary of state, acting governor"; and since the warrant is not so drawn the state treas-

urer refuses to pay it. From this brief statement it can be seen at a glance that the sole question for decision is whether the state treasurer is obliged to pay the warrant; and yet while it is true that the only question for decision is whether the state treasurer must pay the warrant, it is also true that it may be necessary to decide certain preliminary questions before the ultimate question can be reached or decided; and therefore any opinion expressed about the preliminary questions or the ultimate question is not *obiter dictum.* As the writer views it, one of the preliminary questions is whether Ben W. Olcott was, from March 7th to March 31st, merely *ex-officio* governor or governor in his natural capacity. The petitioner is probably entitled to the salary attaching to the office of governor for the period mentioned in the warrant, whether he was merely acting as governor by virtue of his office as secretary of state or whether he was governor in truth and in his natural capacity. I prefer, however, to decide the ultimate question for decision by deciding whether Ben W. Olcott was only secretary of state and merely performing the duties of the office of governor as *ex-officio* governor or whether he was in truth governor, and thus place my conclusion upon stated, certain and defined ground. Furthermore, since the state treasurer will be obliged to pay warrants each month so long as the petitioner is entitled to occupy the office of governor, I think that we can with propriety discuss and determine the question as to how long Ben W. Olcott is entitled to hold the office of governor, and thus decide the rights of the petitioner upon the one hand and the duties of the defendant upon the other.

The conclusion reached by this court in 1884 in *Chadwick* v. *Earhart.* 11 Or. 389 (4 Pac. 1180), when

applied to the same facts confronting us now and here,
indubitably decides that Ben W. Olcott is in truth gov-
ernor.   If Article V, Section 8, of the state Constitu-
tion were now for the first time presented for judicial
construction I would, for reasons which to me are not
only persuasive but convincing, take the view that upon
the removal, death, resignation or inability of the gov-
ernor to discharge the duties of the office, the secre-
tary of state becomes merely *ex-officio* governor.   In
other words, it is my opinion that a correct construc-
tion of the Constitution only empowered Chadwick to
act as governor until he ceased to be secretary of state
and then the duties of the office of governor devolved
upon Earhart, the succeeding secretary of state, until
Thayer qualified as governor; or, applying what I con-
ceive to be the meaning of the Constitution to the in-
stant case, because and only because he is secretary
of state, Ben W. Olcott would perform the duties of
governor until his term as secretary of state expires
on the first Monday in January, 1921, when his suc-
cessor's term as secretary of state shall begin and such
successor would then discharge the duties of governor
until the speaker of the house of representatives at
the session to be held in 1921 publishes the vote for
governor.   Although I would entertain an opinion dif-
ferent from that expressed in *Chadwick* v. *Earhart* if
the question of the construction of Article V, Sec-
tion 8, of the Organic Act were *res integra,* neverthe-
less, whatever the views of any of us may be, candor
compels each of us to admit that the question of the
construction of this section of the Constitution is not
so plain and clear as to be entirely free from serious
debate.   The members of the legislative assembly of
1878 differed in their opinions as to whether Chadwick
or Earhart was entitled to perform the duties of gov-

ernor during the two days which intervened between
the expiration of Chadwick's term as secretary of
state and the commencement of Thayer's term as gov-
ernor; and in the subsequent litigation growing out
of that situation, lawyers and judges differed in their
views as to whether the secretary of state became gov-
ernor in his natural capacity upon the death or resig-
nation of the governor. Stephen F. Chadwick was a
member of the constitutional convention and he as-
serted that he was entitled to hold the office of gov-
ernor until the inauguration of Thayer who had been
elected at the June, 1878, election; but so far as the
writer has been able to discover, every other member
of the constitutional convention, who has left any rec-
ord of his view, was of the opinion that Chadwick was
only governor *ex-officio* and that when Earhart became
secretary of state he and not Chadwick was entitled
to act as governor until the inauguration of Thayer.
The house and senate journals of the session of 1878
contain some interesting information. Before noti-
cing the legislative journals, however, we should first
acquaint ourselves with all the facts entering into the
controversy in *Chadwick* v. *Earhart,* because by so do-
ing we can better understand the story told by the
house and senate journals and better comprehend the
full meaning of the decision rendered in that lawsuit.

Stephen F. Chadwick was elected secretary of state
and L. F. Grover was chosen governor at the June,
1874, election. Each was elected for a term of four
years. At that time the biennial sessions of the legis-
lative assembly commenced on the second Monday of
September in the even-numbered years and this ac-
counts for the fact that there was a regular session
in 1874 and also in 1878; but commencing with 1885
the biennial sessions have begun on the second Mon-

day in January of the odd-numbered years: Article IV,
Section 10, State Constitution; Section 2594, L. O. L.
The Constitution provides that the returns of every
election for governor shall be sealed up and directed
to the speaker of the house of representatives who
shall open and publish them in the presence of both
houses of the legislative assembly: Article V, Section
4. In 1878, as now, the law provided that the term
of office of the governor ceases when his successor,
having been declared elected by the legislative assem-
bly, as provided in the Constitution, shall be inaugu-
rated by taking the oath of office: Deady's Code,
p. 711; Section 3440, L. O. L. See also Chapter 84,
Laws 1913. In 1878, the statute provided that—

"The term of office of the secretary of state, state
treasurer and state printer shall cease on the first day
of the regular session of the legislative assembly next
following the general election on which the terms of
their successors shall begin": Deady's Code, p. 711;
Section 3441, L. O. L.

In 1908 the Constitution was amended so as to read
thus:

"All officers except the governor, elected at any
regular general biennial election after the adoption
of this amendment, shall assume the duties of their
respective offices on the first Monday in January fol-
lowing such election": Article II, Section 14.

The legislative session which was held in 1878 com-
menced on Monday the ninth day of September; R. P.
Earhart was elected secretary of state at the June
1878 election; Chadwick qualified as secretary of state
in September 1874 and by force of the statute then
in existence his term as secretary of state ceased on
September 9, 1878, and Earhart's term as secretary
of state began simultaneously with the termination of

Chadwick's term as secretary of state. The legislative assembly of 1876 elected L. F. Grover United States Senator; and on February 1, 1877, Grover resigned as governor so that he could assume the duties of United States Senator. W. W. Thayer was elected governor at the June, 1878, election. The vote for governor was published by the speaker of the house on September 10th and Thayer "took the oath of office" on September 11, 1878. Chadwick assumed and discharged the duties of governor from February 1, 1877, the date when Grover resigned, until September 11, 1878, the date when Thayer was installed in the office. Chadwick ceased to be secretary of state on September 9, 1878, the date when he was succeeded by Earhart as secretary of state, and notwithstanding the fact that Earhart and not Chadwick was from that time on secretary of state the latter and not the former acted as governor.

The house and the senate each effected a permanent organization on September 9, 1878. On the following day D. P. Thompson of Multnomah County introduced House Joint Resolution No. 2, which reads as follows:

"Resolved, that a committee of three on the part of the House and two on the part of the Senate be appointed to wait on his Excellency, Governor R. P. Earhart, and inform him of the organization of the two Houses, and that they are ready to receive any message he may be pleased to make."

H. Green of Benton County immediately moved to amend the resolution "by striking out the word 'Earhart' and substituting therefor the word 'Chadwick.'" The motion to amend prevailed, and then the resolution, as amended, was adopted by a vote of 34 for with 23 against it. Among those voting against the resolution, as amended, was W. A. Starkweather, who was a

member of the constitutional convention. When H. J. R. No. 2 was received by the Senate that body adopted it. There was but one absentee; and all the members present voted for the resolution. It may be of interest to note in passing that the membership of the senate included at least seven lawyers. According to the journal of the house on September 11th,

"The convention was called to order by the President of the Senate, who stated the object of the convention to be to hear the biennial message of the outgoing executive, Gov. Chadwick, and also, the inaugural address of His Excellency, W. W. Thayer, Governor elect."

Chadwick delivered a message to the joint convention and then Thayer "took the oath of office" and delivered his inaugural address.

We find from an examination of the records that Chadwick, who helped to frame the Constitution, asserted that he was governor; that Starkweather by his vote as a member of the house of representatives denied that Chadwick had authority to act as governor after his term of secretary of state had expired; and that R. P. Boise, who was also a member of the constitutional convention, as a circuit judge decided that Chadwick was not entitled to the salary of governor for any part of the period from February 1, 1877, to September 11, 1878. It is a very significant circumstance that Matthew P. Deady, who was the president of the constitutional convention and afterwards became a very eminent jurist, in his Code of 1866 employs the following marginal heading for Section 8 of Article V: "*Acting* governor in case of vacancy or disability." We find members of the house of representatives, among whom were lawyers of recognized ability, expressing different views; but we also find a

majority of the members of the house affirmatively
and squarely deciding that Chadwick was governor
and we likewise find all the members of the senate,
except a single absentee, unequivocally treating Chad-
wick as governor, presumably with full knowledge of
the controversy that had arisen in the house and of
the decision reached by a majority of the members of
the house concerning the official status of Chadwick.
Although the decision of the legislature does not bind
the court when called upon to construe the Constitu-
tion nevertheless the views of the members of the legis-
lature solemnly expressed at a time when the Consti-
tution was only nineteen years old are not entirely
without significance and may afford some aid. We
find, however, that when the controversy was finally
submitted to an appellate court the question was judi-
cially settled by the unanimous voice of that court.

A judicial decision which is clearly and manifestly
erroneous and, because erroneous, produces injustice
and hardship, should, like the errors of any other tri-
bunal, officer or person, be corrected and righted at
the earliest opportunity; for the doctrine of *stare de-
cisis* was never intended to apply to such a situation;
but when a court is confronted, as we are now, with
a controversy involving the construction of a section
of the Constitution, and the official records of the state
disclose the fact that different persons, bearing the
responsibilities of public office, have in the discharge
of their duties expressed variant opinions, and it ap-
pears that a legislative assembly, removed only nine-
teen years from the date of the adoption of the Con-
stitution, has by unmistakable action decided that the
resignation of the elected governor devolves the office
of governor upon and transfers it to the secretary of
state, and it is shown that an appellate court has by

a unanimous voice adjudged that the death of the
elected governor devolves the office of governor upon
and transfers it to the person who is secretary of state,
the rule of *stare decisis* becomes peculiarly and pre-
eminently applicable because it accomplishes what it
was designed to accomplish, by giving to the law, as
construed by the courts, the qualities of certainty, defi-
niteness and stability. The decision rendered by the
court in *Chadwick* v. *Earhart* ought to be binding upon
us to the extent that it was necessary for the court
to construe Article V, Section 8, in order to decide the
issues presented in that litigation. Turning now to
the pleadings in *Chadwick* v. *Earhart* we find that
Chadwick demanded of Earhart as secretary of state
a warrant for $2,420.75 to cover the salary of governor
for the period, commencing February 1, 1877, and end-
ing September 11, 1878. Earhart refused to issue the
warrant. Chadwick brought a proceeding for the pur-
pose of compelling the issuance of the warrant. The
stipulation, upon which the case was tried, contained
the following recital:

"Mr. Earhart objects to the salary being paid from
the 9th day of September, 1878, to the 11th day of
September, 1878—two days on the ground that Mr.
Chadwick was not secretary of state after Mr. Ear-
hart was sworn in on the 9th day of September, 1878,
though Mr. Chadwick acted as governor until and in-
cluding the 11th of September, 1878."

Thus it will be seen that the question of salary cov-
ered two periods: (1) From February 1, 1877, to Sep-
tember 9, 1878, or the period during which Chadwick
was secretary of state; and (2) from September 9,
1878 to September 11, 1878, or the period during
which Chadwick was not secretary of state. The
court decided that Chadwick was entitled to the salary

of governor for both periods and hence in order to reach that decision it became necessary to construe Article V Section 8, and to determine whether Chadwick was simply *ex-officio* governor while secretary of state or whether the office devolved upon him in his natural capacity thus making him governor in truth; and since the court determined that the office of governor devolved upon Chadwick in his natural capacity making him governor in truth, that decision ought to be accepted as final and ought to govern now just as it governed then.

However, as I read it, the written opinion rendered in *Chadwick* v. *Earhart* does not decide that the people cannot elect a governor at the general election to be held in 1920 or that the person so elected cannot qualify and assume the office of governor when the speaker of the house publishes the vote in January, 1921, after the legislature convenes. Ben W. Olcott was elected secretary of state at the November, 1916, election and his term as such will expire on the first Monday in January, 1921. His successor will be elected at the November, 1920, election and such successor will assume the duties of secretary of state on the first Monday in January, 1921. James Withycombe was elected governor at the November, 1918, election and he qualified on January 14, 1919, after the speaker of the house of representatives published the vote cast for governor. James Withycombe was elected for a term of four years ending in January, 1923; but he died on March 3, 1919, and hence two regular elections will be held between the date of his death and the end of the four year period for which he was elected. In this respect the facts in *Olcott* v. *Hoff* are essentially different from the facts in *Chadwick* v. *Earhart;* for in the latter case Grover resigned

on February 1, 1877, and a governor was elected at the very first opportunity which was in June, 1878, and the elected governor assumed the duties of the office at the very first opportunity which did not occur until the speaker of the house published the vote cast for governor.    When in *Chadwick* v. *Earhart* the court speaks of ".the remainder of the term of the outgoing governor" reference is made to the "remainder" left after February 1, 1877; for the court was dealing with that and no other "remainder."    The court was not called upon to decide, nor did it attempt to decide, whether · Chadwick could have occupied the office of governor from February 1, 1875, if Grover had resigned on that date, and held it through two elections, one in 1876 and the other in 1878. · As I read the opinion in *Chadwick* v. *Earhart,* no expressions appearing there or rule applied there can be found sustaining the view that the people cannot elect a governor at the next election to be held in November, 1920. When James Withycombe died, the Constitution appointed Ben W. Olcott, because he was secretary of state, governor "until * * a governor be elected," so that the office will not be without an occupant "until * * a governor be elected."    If we apply to the facts presented to us the same rules that were applied in *State ex rel.* v. *Johns,* 3 Or. 533, the conclusion is unavoidable that the legal voters can, at the election to be held in November, 1920, elect a governor who can assume the office in 1921 when the speaker of the house publishes the vote cast for governor.    Be it remembered, too, that it was R. P. Boise, a member of the constitutional convention, who as circuit judge decided *State ex rel.* v. *Johns* in the Circuit Court and that his reasoning was repeated with approval and that his conclusion was affirmed when the Supreme Court de-

cided the same case on appeal; and, moreover, one of the judges participating in the decision announced by the Supreme Court was P. P. Prim, also a member of the constitutional convention. The doctrines which were announced and applied in *State ex rel.* v. *Johns* were again recognized in *State ex rel.* v. *Ware,* 13 Or. 380 (10 Pac. 885), and at a more recent date followed by a majority of the court, as now constituted, in *State ex rel.* v. *Kellaher,* 90 Or. 538 (177 Pac. 944). The same rule was followed and put into practice when Ben W. Olcott was elected secretary of state at the 1912 election to succeed Frank W. Benson who had died in April, 1911, after having been elected in 1910 for the full term of four years. Suppose that Frank W. Benson had not died in April, 1911, but that he had lived and filled out his term and that Ben W. Olcott had been elected secretary of state in 1914 and re-elected in 1918 contemporaneously with the re-election of James Withycombe as governor and suppose that Ben W. Olcott should to-day resign both the office of secretary of state and governor; Would anyone be so bold as to contend that the president of the senate would be entitled to act as secretary of state and also as governor or that he could act as either until 1923? The framers of the Constitution deliberately provided for the two offices of governor and secretary of state and they intended that those offices should be occupied by different persons so long as possible; but anticipating the possibility of death, resignation or removal they provided for those contingencies by declaring that the secretary of state shall be automatically appointed governor "until * * a governor be elected." This automatic appointment is temporary and ends just as soon as the people can elect a governor at the next biennial election. When the writers of the Con-

stitution made the governor, secretary of state and
state treasurer a board of commissioners for the sale
of school and university lands and for the investment
of funds arising therefrom they did so for the mani-
fest purpose of bringing to the business the judgment,
wisdom and experience of three men; and every one
of the various subsequent acts of the legislature mak-
ing these officers the constituent members of boards
was framed for the same purpose. The makers of the
Constitution did not intend that one person could
occupy more than one of these offices any longer than
was necessary.

In Article II, Section 10 we read that no person
shall "hold more than one lucrative office at the same
time, except as in this constitution expressly per-
mitted." There is no provision in the Constitution
expressly or by manifest implication declaring that
the secretary of state shall hold the office of governor
through two biennial elections; but upon the contrary
the whole plan and purpose of the Constitution nega-
tives the idea that the secretary of state can hold any
longer than is necessary. The Constitution provides
for the two offices of governor and secretary of state
because the framers of the organic act deemed two
offices necessary; one person is prohibited from hold-
ing two lucrative offices except as in the Constitution
*expressly* provided, because the framers of the organic
act deemed it desirable that one person hold only one
lucrative office. The rule established by the Consti-
tution is that one person can hold but one office; for
one person to hold two offices is the exception. The
framers of the Constitution anticipated the contingen-
cies of death, resignation or removal by providing for
the exception. The important business of the man-
agement of school and university lands and funds was

placed in the hands of three and not two persons. A board of three persons is the rule; a board of two persons is the exception. The office of governor as well as that of secretary of state is elective. An election is the rule; an appointment is the exception. Finding as we do that two offices with two persons as the officers is the rule while two offices with one person acting as the two officers is the exception, that an election is the rule and an appointment is the exception, that a board of three commissioners for the management of the school and university lands and funds is the rule, while a board with two commissioners is the exception, we would also expect to find provisions terminating the exceptions, whenever they occur, and reestablishing the rule at the very earliest opportunity. The rule was provided for because it was deemed to be the best; the exception was provided for because it was deemed to be the next best; and naturally the theory of the Constitution is that the best shall be had as long as possible while the next best shall be had only so long as necessary. As shown by the stipulation filed in *Chadwick* v. *Earhart* the "remainder" discussed and referred to in that case only covered the short period which intervened between the end of Chadwick's term as secretary of state and the commencement of Thayer's term as governor. That case as well as every case must be read in the light of the facts presented to the court. The conclusion that the office of governor can be filled by the people at the next election harmonizes every part of the Constitution with every other part, gives full meaning to every word and every section, and as said in *State ex rel.* v. *Johns* "is in perfect accord with the spirit of our constitution and laws."

There is no analogy whatever between the offices of
President and Vice-president of the United States on
the one hand and those of governor and secretary of
state on the other. By the express language of the
Constitution of the United States the President "shall
hold his office during the term of four years, and, *to-
gether with the Vice-president,* chosen for the same
term, be elected as follows." Our Constitution does
not tie the office of governor to that of the secretary
of state; nor does it tie the latter to the former. The
governor is elected "at the times and places of
choosing members of the legislative assembly": Arti-
cle V, Section 4. Members of the legislature are
elected at the general elections which are held bienni-
ally. In brief, I take the view that Ben W. Olcott is
governor in truth as distinguished from governor *ex-
officio;* that he is entitled to hold the office of governor
and is entitled to the salary of that office until his
successor is elected and qualified; and that the legal
voters are entitled to elect a governor at the next elec-
tion to be held in November, 1920, and that the person
so elected is entitled to assume the duties of the office
when the vote is published by the speaker of the house
of representatives in January, 1921. I think, too, that
the logic of the holding in *Chadwick* v. *Earhart* inevi-
tably leads to the conclusion that the petitioner can
resign as secretary of state and continue to occupy
the office of governor.

BENSON, J., concurs.

BENNETT, J., Specially Concurring.—In this case
it appears from the pleading that the petitioner, who
was secretary of state at the time of the death of
Governor Withycombe, and who has assumed the office

of governor, drew his warrant on the state treasurer for $336, being the salary as governor from the death of Governor Withycombe to the 1st of April. This warrant was drawn "In payment of the salary due said Ben W. Olcott, as Governor."

The defendant, the state treasurer, refused to honor this warrant upon the ground that it should have been drawn to "Ben W. Olcott, Secretary of State, Acting Governor."

It seems the legal controversy between the parties is over a mere matter of words—the one claiming the warrant should be drawn for his salary "as Governor," and the other that the warrant should have been drawn in his favor as "Acting Governor."

I do not think there is any question but what the warrant was sufficient and, therefore, in any view, should have been honored, and that the plaintiff is entitled to the relief prayed for. I therefore concur in the result of the opinion of Mr. Justice JOHNS.

The real purpose of the proceeding was, no doubt, to test questions which, as I view them, go far beyond the real question involved in the case. However important the public questions involved may be, I do not think we have any authority to go beyond the case presented to us. If we did and should decide questions not presented, our decision would be mere *dictum,* and not binding upon our successors, or even upon us individually, if we should change our individual opinion at some future date.

No doubt the power should be vested in the courts to pass upon moot questions of great public interest like this, in an authoritative way, but so far the legislature does not seem to have conferred that power. I, therefore, reserve my opinion as to the question of whether or not the petitioner will continue to hold the

office of governor personally after he ceases to be sec-
retary of state, and as to the kindred questions urged.

In view of the opinions written by the Chief Justice,
and some of the other justices, I deem it necessary to
add something to the above brief expression of my
views.

I do not view the authorities cited by Mr. Chief Jus-
tice McBRIDE, in relation to our authority or lack of
authority, to pass upon questions in no way involved
in the case before us, as at all in point, or as giving
us the slightest authority to go beyond the issues pre-
sented in this case.

In all of these cases the questions decided by the
court were squarely within the issues made by the
pleadings, and the decision was entirely pertinent and
responsive to the actual case in litigation. In some
of them the decision of the court could still be made
partly or wholly effective. In others, by reason of
the lapse of time or the happening of some event, be-
tween the decision of the lower court and that of the
appellate tribunal, the decree in the particular case,
could no longer be enforced, but the issues between the
parties, which were living issues at the time of the
commencement of the action, still remained. In such
a case it is well settled that the appellate court may
retain and decide the case, or it may, at its option,
refuse to proceed further and dismiss the appeal.

The leading case cited—*Giles* v. *Harris,* 189 U. S.
475 (47 L. Ed. 909, 23 Sup. Ct. Rep. 639), belongs to
the former class of cases, and the questions decided
were not only clearly within the issues made by the
pleadings, but were still practical living issues in the
case at the time of the ultimate decision.

That case was a suit brought by a colored man in
the State of Alabama, on behalf of himself and five

thousand other colored voters, against the board of
registrars of Montgomery County, to secure the right
of permanent registration, and also the registration
for the coming election in November. Before the
hearing was reached in the United States Supreme
Court, that election had passed, but there still re-
mained in the case the question of *permanent regis-
tration.* It was in such a case that the language,
quoted with so much apparent assurance that it is an
authority in this case, was used. The court said:

"To be enabled to cast a vote in that election is
not * * the whole object of the·bill. It is not even
the principal object of the relief sought by the plain-
tiff. The principal object * * is to obtain the perma-
nent advantages of registration."

The court denied the relief upon two grounds.
Having considered the case and found against the
plaintiff upon one ground, it also proceeded to con-
sider the second ground and decide against him as to
that also, and it was in this connection that the court
used the language, which is referred to in the second
quotation:

"We are unwilling to stop short of the final con-
siderations, which seem to us to dispose of the case."

Here, then, was simply the common occurrence of
there being *two* grounds upon which a case could be
decided—*both of them squarely within the issues of
the case* and the court deciding them both. In such a
case, I think it is well settled that the court may dis-
pose of the case upon one ground alone, or may prop-
erly pass upon both questions involved.

I cannot see how such a case furnishes an iota of
authority, for us to go entirely outside. of every issue
in this case, and decide questions that are not in the
case at all.

It is a significant fact in the Giles case *supra,* that one of the questions urged was, that the new Constitution of Alabama was in conflict with the Federal Constitution, and, therefore, void. No question, it would seem, could exceed such a question in public importance, yet the court refused to pass upon it, saying:

"We express no opinion as to the alleged fact of their unconstitutionality."

Another significant thing is, that the court cites with approval the previous case of *Mills* v. *Green,* 159 U. S. 651 (40 L. Ed. 293, 16 Sup. Ct. Rep. 32), in which the same court had used the following language:

"The duty of this court, as of every other *judicial* tribunal, is to *decide actual controversies* by a judgment which can be carried into effect and not to give opinions *upon moot questions* or abstract propositions, or to disclose principles or rules of law, which cannot affect *the matter in issue,* in the case before it."

The case of *Memphis* v. *Rapid Transit Co.,* cited from 133 Tenn. 99 (179 S. W. 635, Ann. Cas. 1917C, 1045, L. R. A. 1916B, 1143), was a suit by a street-car company against a jitney company, for operating jitneys in competition, the plaintiff relying upon an act of the legislature. The defendant demurred to the complaint, relying upon two grounds, one of which was that the act was unconstitutional. At the hearing it was claimed the case could be decided upon other grounds than the constitutional question, and that, therefore (under the practice in that state), the cause should have been appealed to a different court. The court held the constitutional question squarely in the case, and therefore proceeded to decide the same. It was under these conditions and in regard to such a case, that the court used the language quoted.

The case of *Boise City Land Co.* v. *Clark,* cited from 131 Fed. 415 (65 C. C. A. 399), was a case brought by a water company in Idaho against the county commissioners to annul an order fixing the rate it could charge in the year 1901 for water from its canals. The case was tried in the United States Circuit Court and appealed to the Court of Appeals. Before it could be reached for hearing in the latter court, the period for which the rates were fixed for that season had expired. Nevertheless the court proceeded to decide the case, which involved no question of general public importance, but the questions decided were all squarely within the issues and necessary to a decision.

It is one thing to decide the issues actually presented in a case, even although something has happened pending the appeal, making the judgment ineffective, and an entirely different matter to go clear outside of the issues, as we are asked to do.

In many cases, as in the fixing of rates for a particular year, or the right to vote at a particular election, it is impossible to reach a decision in the appellate courts before the party's right in the particular instance has expired; and he could never have the question, or his rights decided, if his cause should be dismissed upon that ground. In such cases the courts have always, and I think properly, exercised their discretion to dismiss the cause, or to hear and decide it, as seemed just under the particular circumstances.

The other cases of *State* v. *Stutsman,* 24 N. D. 68 (139 N. W. 83, Ann. Cas. 1914D, 776) ; *State* v. *Tel. Co.,* 65 Fla. 67 (61 South. 119) ; *Commonwealth* v. *Klaus,* 145 App. Div. 798 (130 N. Y. Supp. 713) ; *In re Fairchild,* 151 N. Y. 361 (45 N. E. 943) ; *People* v. *General Committee,* 25 App. Div. 339 (49 N. Y. Supp. 723), and *In re Morgan,* 114 App. Div. 45 (99 N. Y. Supp. 775),

cited in Chief Justice McBride's opinion, are all exactly similar in principle and in questions involved, to the case of *Boise City* v. *Clark,* 131 Fed. 415 (65 C. C. A. 399), and are no more in point. It will be noticed that in every one of them there was a *real lawsuit* between real adversary parties. In no one of them did the court *go outside of the issues made by the pleadings.*

There is no case cited, and I do not think any one can be found, in which the court has deliberately and intentionally gone clear outside of the issues (as we are asked to do) and decided questions which were not and never had been in the case.

If we do this we are not following any beaten path— we have no precedents—we are cutting the fences that have marked the boundaries of proper judicial authority, ever since we have had English speaking courts. The common law never gave us any such authority. Neither did the state Constitution, nor has the legislature. Our only pretense of authority will be the invitation of public officers, who have no more statutory right to invite us to make the decision, than we have to accept the invitation.

I do not wish to quibble or to shirk my share of responsibility in deciding any question that is properly before the court. Neither am I willing to be stampeded into a decision I have no right to make, nor to rush headlong to the exercise of powers I do not possess, in order that I may have the satisfaction or the notoriety, of helping to decide some important question.

This is not a case where the questions presented have become merely academic, after the case was commenced, by reason of the lapse of time. Here the question as to who will be governor, if the secretary of state resigns, or if another governor should be

elected at the election in 1920, never was in the case, and could not be, for no such state of facts yet exists. The question may never arise. Mr. Olcott may never resign as secretary of state. He may run for governor himself at the next election.

To accept and amplify Mr. Chief Justice McBRIDE's homely illustration, this is not a case where anyone has suggested to "cut the dog's tail off by inches." It is a case where, because one dog has a broken tail, which needs amputation, we are asked to drag in the other dogs in the community and mutilate them, because their tails might, possibly, be broken at some time in the future.

If another secretary of state, elected at the next election, shall claim the office of governor, he will have a right to be heard. There will then be an actual controversy, and I think he ought not to be foreclosed, by any premature decision we may now make, in a "mock trial" on a "moot" question in an arranged and fictitious lawsuit.

As a citizen, I have a more or less well-defined opinion as to all the questions suggested here, formed partly from my own impressions and partly from the briefs of the attorney general, and those of public spirited citizens, who—at the invitation of the court—have taken enough time from their private business, to file more or less careful briefs in the case. If I should don my official robe and attempt to give my half-baked street opinions judicial utterance, I would agree with Mr. Chief Justice McBRIDE as to the result, but not as to the reasoning or analogies by which he has reached that result. On the other hand, I should agree with Mr. Justice HARRIS as to his reasoning, up to a certain point, but not as to the result reached by him. But if I should attempt to do so, some other

judge succeeding me, might properly refuse to give my opinion any binding force. He might well conclude, that it takes more than a judge and a gown, to make a judicial decision.

I shall content myself, therefore, with the expression of an opinion on the questions really in issue, and upon which, as I understand, we are all agreed.

BURNETT, J., Concurring in Part.—In this case an alternative writ of *mandamus* was issued out of this court, directed to the defendant, from which, barring a clerical omission, we learn in substance that James Withycombe, the duly elected and inaugurated governor of the state, died March 3, 1919, at which time the petitioner, Ben W. Olcott, was the duly elected, qualified and acting secretary of state and has since then continued to hold the latter office. It is further recited that on April 1, 1919, the secretary of state issued a warrant in favor of Ben W. Olcott for $336, in payment of the salary due him for service as governor of the state from March 7 to March 31, inclusive, 1919, which warrant the petitioner herein has presented to the defendant as state treasurer and the latter fails and refuses to pay the same although there is money in his hands applicable to the payment of the salary of the governor. By the writ, the defendant was required to show cause why he had not paid the warrant. On the return day the defendant demurred, not to the petition for the writ, but as the statute requires (L. O. L., § 618), to the writ itself, on the ground that it does not state facts sufficient to constitute a cause of action against the defendant.

The sole question presented is whether the defendant is right in refusing to pay the warrant in question. We have nothing to do with the petition. It has per-

formed its office in securing the issuance of the writ, for, as shown in Sections 618, 619 and 620, L. O. L., the pleadings in a proceeding by *mandamus* are the alternative writ, the demurrer or answer to the same and the demurrer or reply to the answer, and none others are allowed.  They are to "have the same effect and to be construed and may be amended in the same manner as pleadings in an action."

Admitted, as it is, that the regularly elected governor died during his incumbency in office and that the petitioner here was at the time the duly elected, qualified and acting secretary of state, we are not at present concerned about whether he is performing the duties of the office of governor as *de facto* or *de jure* governor, or merely by virtue of the authority vested in him as secretary of state, or, in other words, as an alternate upon whom the Constitution imposes the functions of governor in case of the death of the latter officer.  So far as public interests are concerned or the rights of the people are involved, it matters not in which of the two suggested capacities the duties and the authorities of the executive office are exercised, so they are performed.  It is said in the writ:

"That under and by virtue of Section 8, Article V of the Constitution of Oregon, the office of governor and the duties thereof devolved upon the secretary of state, and that on the 7th day of March, 1919, petitioner, Ben W. Olcott, took the oath of office, and that since that time he has been and now is the governor of the state of Oregon."

This states but a mere conclusion of law and presents no issuable fact.  Neither is it directly averred that the petitioner has performed any of the duties or exercised any of the powers of governor.  It is presumed, however, that official duty has been regularly

performed, whether it be that of the secretary of state or that of a successor to a deceased governor. Indeed, it may well be doubted whether an auditing officer can assume to pass upon the amount or quality of service of any individual upon whom official duties have been cast by operation of law.

Coming to the precise question of whether the petitioner is entitled to the salary which otherwise would have been paid to the elected governor had he survived, the rule is well stated in *Preston* v. *United States* (D. C.), 37 Fed. 417, 418, thus:

"If there be no incompatibility between the respective duties of the two offices or employments and the functions of each are separate and distinct, he is entitled to recover two compensations."

Article V, Section 8, of the Constitution reads thus:

"In case of the removal of the governor from office, or of his death, resignation or inability to discharge the duties of the office, the same shall devolve upon the secretary of state; and in case of the removal from office, death, resignation or inability, both of the governor and secretary of state, the president of the senate shall act as governor until the disability be removed, or a governor be elected."

Whatever view may be taken of this clause of the fundamental law, as to the capacity in which the petitioner shall administer the duties of the chief executive, it is plain that by force of the Constitution itself the duties of the two offices are not incompatible with each other, however separate and distinct they may be. In other words, the Constitution itself casts the performance of the duties of both offices upon the same individual under certain circumstances, with the result that they are constitutionally compatible with each other. Under such circumstances, the extra duty hav-

ing been performed, as we must presume it has been, the petitioner is entitled to the compensation which the law provides for such service. As stated by Mr. Chief Justice BIGELOW in *State ex rel.* v. *La Grave,* 23 Nev. 216 (45 Pac. 243, 35 L. R. A. 233):

"Another reason that may be offered for this conclusion is that it is a general principle of justice and right that when one regularly performs the duties of an office he should be entitled to the emoluments thereof."

In *United States* v. *Saunders,* 120 U. S. 126 (30 L. Ed. 594, 7 Sup. Ct. Rep. 467), the claimant drew a salary as clerk of a committee of Congress and likewise as clerk in the President's office. The duties of the two were held not to be incompatible and hence his claim was allowed for both salaries. In *State* v. *Roddle,* 12 S. D. 433 (81 N. W. 980), the defendant was a secretary of state and likewise was made by a statute a member of the state committee on brands and marks, carrying with it an additional compensation, and it was held that he was entitled to both emoluments. Similarly, in *State ex rel.* v. *Walker,* 97 Mo. 962, the individual who held the office of secretary of state and was also a member of the board of equalization was allowed pay for both positions. In *Scranton School District* v. *Simpson,* 133 Pa. St. 202 (19 Atl. 359), and in *McCauley* v. *School District,* 133 Pa. St. 493 (19 Atl. 410), the occupant of the office of city treasurer, who was *ex-officio* treasurer of the school district, was allowed the statutory compensation for both positions. The same doctrine is taught in *United States* v. *McDaniel,* 7 Pet. 1 (8 L. Ed. 587); *United States* v. *Ripley,* 7 Pet. 18 (8 L. Ed. 593); *United States* v. *Felleborn,* 7 Pet. 28 (8 L. Ed. 596), and in *Milnor* v. *Metz,* 18 Pet. 221 (10 L. Ed. 943). In *Love*

v. *Baehr,* 47 Cal. 364, the attorney general, to whom was allowed by law a statutory salary, was also made a member of the board of examiners, carrying with it a special additional compensation, and he was sustained in his claim for both emoluments. *In re Conrad,* 15 Fed. 641, is a case where the same individual was claiming fees as chief supervisor and as a United States commissioner, and his claim was sustained; and in *Smith* v. *Waterbury,* 54 Conn. 174 (7 Atl. 17), the city attorney had a salary allowed to him by law and a statute allowing him certain fees for special services was sustained. In other words, the common-sense principle is that he who performs services enjoined upon him by law is entitled to the compensation provided by the same law for those particular services, in the absence of anything restricting the emolument to a single office.

It is true that Article II, Section 10, of the organic law declares that:

"No person holding a lucrative office or appointment under the United States or under this state shall be eligible to a seat in the legislative assembly; nor shall any person hold more than one lucrative office at the same time, except as in this constitution expressly permitted."

This must be read in connection with Article V, Section 8, already quoted. If the latter section be construed to invest the petitioner with the office of governor both *de facto* and *de jure,* it would constitute an exception within the meaning of Section 10 of Article II. On the other hand, if it be held that he is merely exercising functions of the office of secretary of state visited upon him on account of the death of the elected governor, he would not be holding more

than one lucrative office within the meaning of the latter section.

This disposes of the question presented by the pleadings for our consideration. All else respecting the length of time the petitioner shall perform the duties of governor or whether he has authority to resign the office of governor or resign the office of secretary of state and continue to hold as governor, or whether he can obstruct the order of succession provided by Section 8 of Article V by appointing a secretary of state to succeed himself, is not presented by the instant record, and any attempt to dispose of these matters in this proceeding would be gratuitous *dictum.* The only excuse for discussing those questions is found not in any allegation even of the petition itself and much less in the writ which is the primary pleading, but only in the last clause of the prayer of the petition, as follows:

"And this petitioner particularly prays that this court will define his duties and powers in relation to the office of Governor."

Nowhere in the record does the petitioner intimate any desire for advice or decision about his right to resign any office or concerning the length of time he will be required or permitted to exercise its functions. As already pointed out, the petition is no part of the pleadings: *McLeod* v. *Scott,* 21 Or. 111 (26 Pac. 1061, 29 Pac. 1); *Elliott* v. *Oliver,* 22 Or. 44 (29 Pac. 1); *Shively* v. *Pennoyer,* 27 Or. 33 (39 Pac. 396). The clause of its prayer, if indeed we may consider it at all, amounts simply to a request for the court to give counsel to the petitioner on a question not presented by the record. It does not call for any decision. It is said in Section 957, L. O. L.:

"Any judicial officer may act as an attorney in any action, suit or proceeding to which he is a party or in which he is directly interested. A judge of the county court or justice of the peace, otherwise authorized by law, may act as an attorney in any court other than the one of which he is judge, except in an action, suit or· proceeding removed therefrom to another court for review; but no judicial officer shall act as attorney in any court, or otherwise, other than as in this section allowed. * * "

In effect, at least, if we undertook to advise the petitioner concerning "his duties and powers in relation to the office of governor" we would violate this provision of the statute. Moreover, as declared in Chapter 196, Laws of 1915, it is the function of the attorney general when requested to do so by any state official, to give his opinion in writing upon any question submitted to him in which the State of Oregon may have an interest, and he shall, when requested, give legal advice to any of said officials, boards or commissions. For this court or its members to give such counsel as the petitioner in his ,prayer requests would be to usurp the functions of the attorney general in contravention of Section 1 of Article III of the Constitution, dividing the powers of government into three separate departments, the legislative, the executive, including the administrative, and the judicial, and forbidding any person charged with official duties under one of these departments to exercise any of the functions of another. All we are called upon by the record before us to decide is the issue of law presented by the demurrer to the writ. All beyond that would be unwarranted and would not bind anyone. We could not compel the petitioner to resign either the office of secretary of state or of governor, nor could we restrain him on the record from doing either of those acts, any

more than we could direct him in the care of his children or the investment of his money. It would present a situation thus described in 3 Words & Phrases, 2052:

"The mere *dictum* of a judge is not the decision of a court. There is nothing authoritative in a case except what is required to be decided to reach the final judgment, and what, by the judgment, becomes *res adjudicata* between the parties as to the subject matter of the suit. *Love* v. *Miller*, 53 Ind. 294 (21 Am. Rep. 192). 'An *obiter dictum* is a gratuitous opinion, an individual impertinence, which, whether it be wise or foolish, right or wrong, bindeth none, not even the lips that utter it. Old Judge'—taken from the title page of a work on 'Obiter Dicta,' published by John D. Allen; New York, 1885: *Hart* v. *Stribling*, 25 Fla. 433, (6 South. 455, 456.)"

For these reasons I concur in the direction that a peremptory writ issue commanding the state treasurer to pay to the petitioner the amount of the warrant in question; but I object to the gratuitous statement in the opinion of Mr. Justice Johns about the length of time the petitioner may discharge the duties of the chief executive of the state, as not within the issue presented by the record and not even requested by either party.