Argued on demurrer to petition for alternative writ December 18, 1919, demurrer sustained January 13, 1920.

STATE EX REL. v. OLCOTT, SECRETARY OF STATE.

(187 Pac. 286.)

States — Automatic Succession to Governorship on Death During Term.

1. Under Article V, Section 8, of the Constitution, in case of death of the governor during his term of office, the secretary of state becomes governor to serve for the unexpired term of four years provided by Sections 1 and 7 and Section 8 providing a line of automatic succession from governor to secretary of state and to president of the senate, having been adopted to prevent a vacancy in the office of governor.

[As to the existence and effect of vacancy in office of governor, see note in Ann. Cas. 1915A, 577.]

Courts—Rule of Stare Decisis Applies With Peculiar Force to Decisions on Constitutional Questions.

2. The rule of *stare decisis* applies with peculiar force to the decision of courts on question of constitutional law, and a particular construction of a constitutional provision having been adopted, it will be recognized and enforced subsequently.

[As to limitations on the doctrine of *stare decisis*, see notes in 27 Am. Dec. 628; 73 Am. St. Rep. 98.]

Original proceeding in *mandamus.*

In Banc.

This is an original petition for a writ of *mandamus*, in which the relator alleges that he is a natural born citizen of the United States, over twenty-one years of age, has been district attorney and a resident of Jack-

son County for more than one year last past and is now
a resident and legal voter therein for all state and
county offices; that the defendant is the duly elected,
qualified and acting secretary of state; that on Novem-
ber 5, 1918, James Withycombe was duly elected gov-
ernor of the State of Oregon and duly qualified for
that office on January 14, 1919; that the defendant was
elected secretary of state on November 7, 1916, and
duly qualified on December 26, 1916; that on March 3,
1919, James Withycombe, the duly elected and qualified
governor, died; that the office of governor and the
duties thereof then devolved upon the secretary of
state; and that on March 7, 1919, the defendant took
the oath of office and assumed the duties of governor.
The relator contends that the defendant should hold
the office only until the first Monday in January, 1921,
and not for the unexpired term of the late Governor
Withycombe; that under the laws and Constitution of
the State of Oregon the office of governor will become
vacant on the first Monday in January, 1921; that the
said office should be filled at the general election to be
held November 2, 1920, by the legal voters; that it is
a duty especially enjoined upon the defendant to pre-
pare and furnish to each county clerk a statement
showing the several state offices for which candidates
are to be chosen in the respective counties at the pri-
mary nominating election to be held May 21, 1920; and
that the defendant has neglected and refused to per-
form the said duty in this, that he has failed to name
in such statement the office of governor of the State of
Oregon, for which nomination should be made at the
coming primaries. The petitioner demands that the
statements sent to the county clerks of the various
counties of the state be corrected by naming therein

the office of governor of the State of Oregon, charging
that the defendant has refused to make such correc-
tion.   He prays for an alternative writ of *mandamus*
directed to the defendant, compelling him to correct
said statements and include therein the office of gov-
ernor, or show cause why he should not do so.   A cer-
tified copy of the notice sent to the county clerk of
Jackson County with such omission is attached to and
made a part of the petition.

The attorney general appeared for the defendant,
filing a general demurrer alleging that the petition
"does not state facts sufficient to constitute a cause of
action."          WRIT DENIED.   DEMURRER SUSTAINED.

*Mr. G. M. Roberts, in pro. per.,* for the petition.

*Mr. George M. Brown,* Attorney General, for the
demurrer.

JOHNS, J.—1. In legal effect, the question now be-
fore us is the one which was sought to be presented in
the case of *Olcott* v. *Hoff,* 92 Or. 462 (181 Pac. 466),
but was not then decided, because some members of
this court did not think the question was legally before
it and for such reason no four members could then
agree upon an opinion.   The controversy now has to
do with whether Mr. Olcott ceases to be governor when
his term of office as secretary of state expires, or
whether he shall continue to hold that office for the re-
mainder of the unexpired term of the late Governor
Withycombe.   The vital question to be determined is:
What was legally decided in the case of *Chadwick* v.
*Earhart,* 11 Or. 389 (4 Pac. 1180), and how far is that
decision binding upon this court?

It was the intention of the framers of the original Constitution that all of the administrative officers of the state should be elected for the period of four years and at the same election. Section 1 of Article V of the Constitution provides:

"The chief executive power of the state shall be vested in a governor, who shall hold his office for the term of four years; and no person shall be eligible to such office more than eight in any period of twelve years."

And Section 7 is as follows:

"The official term of the governor shall be four years; and shall commence at such times as may be prescribed by this Constitution, or prescribed by law."

Section 16 of that article says:

"When during a recess of the legislative assembly a vacancy shall happen in any office, the appointment to which is vested in the legislative assembly, or when at any time a vacancy shall have occurred in any other state office, or in the office of judge of any court, the governor shall fill such vacancy by appointment, which shall expire when a successor shall have been elected and qualified."

In our first Code, compiled by Hon. M. P. DEADY, Section 16 is annotated by him to read:

"Governor to fill vacancies by appointment."

That construction has been followed, and all appointments to state offices have been made by the governor, who alone is vested with that authority; but there is no provision for the appointment of a governor and there has never been a vacancy in that office. To prevent that and to provide a line of succession, Section 8 of Article V of the Constitution was adopted, reading thus:

"In case of the removal of the governor from office, or of his death, resignation, or inability to discharge the duties of the office, the same shall devolve on the secretary of state; and in case of the removal from office, death, resignation, or inability, both of the governor and secretary of state, the president of the senate shall act as governor, until the disability be removed, or a governor be elected."

Although it is true, as Mr. Justice HARRIS has pointed out in his opinion in *Olcott* v. *Hoff*, that in annotating this section Judge DEADY used the words, "Acting governor in case of vacancy or disability," it is also true that in the later Code compiled by Deady and Lane the same section was annotated to read, "In case of vacancy or disability."

The decision in *Chadwick* v. *Earhart* was rendered by a unanimous court in October, 1884. Hill's Code was annotated and published in 1892, and in annotating Section 8 of Article V of the Constitution Mr. Hill said:

"Secretary as governor.—The secretary of state entering upon the duties of governor, upon the governor's resignation, may continue to perform the functions of governor for the remainder of the governor's term of office, though he cease in the meantime to be secretary of state: *Chadwick* v. *Earhart,* 11 Or. 389 (4 Pac. 1180)."

Bellinger & Cotton's Code was published in 1902 and the compilers then made the following annotation to the section mentioned, citing *Chadwick* v. *Earhart*:

"The secretary of state entering upon the duties of governor, upon the governor's resignation, may continue to perform the functions of governor for the remainder of the governor's term of office though he ceases in the meantime to be secretary of state."

Lord's Oregon Laws were published in 1910 and the following annotation therein is made to that section:

"Under this provision, when the governor resigns, the duties of the governor's office devolve upon the secretary of state, who continues to perform them for the remainder of the term of the outgoing governor: *Chadwick* v. *Earhart*, 11 Or. 389 (4 Pac. 1180)."

Mr. Lord was one of the judges by whom the decision in *Chadwick* v. *Earhart* was rendered in 1884.

While we respect Judge DEADY for both his learning and ability, any construction which he may have placed upon Section 8 was given before the decision in the Chadwick case was rendered. It must be conceded that Judge Bellinger and W. W. Cotton were men of equal learning and ability, and their annotation was made after that case was decided. The same is true as to W. Lair Hill, who was recognized as one of the ablest lawyers in Oregon. The decision in the Chadwick case was rendered by a unanimous court then consisting of Chief Justice WALDO, E. B. WATSON and W. P. LORD, and it is significant that in compiling his own Code, under Section 8 of Article V, Mr. Lord made the annotation above quoted.

We have no record of the oral arguments, but as pointed out in our opinion in *Olcott* v. *Hoff*, two questions were raised in the respective briefs filed in the Chadwick case. Mr. Earhart, then secretary of state, contended first that Mr. Chadwick was not entitled to the salaries of both governor and secretary of state, after he had become governor by the resignation of that office by Mr. Grover, but to that of secretary of state only; and second, that he was not entitled to the salary of the governor's office after he ceased to be secretary of state. Mr. Chadwick claimed that he was entitled to the salaries of both offices during the time he was secretary of state and governor, and to the salary of governor for the two days that he held that

office after he ceased to be secretary of state. Both of Mr. Chadwick's contentions were sustained by the unanimous decision of the court. On the second point, the right to the salary of governor after he ceased to be secretary of state, the court held:

"This question * * must also be answered in favor of the appellant and judgment be entered accordingly."

By reason of that decision Mr. Chadwick was paid the salary for the two days that he held the office of governor after ceasing to be secretary of state. The cause of action was for a lump sum of money which included both claims and for the reasons stated in the opinion each of his claims was allowed. The conclusion is inevitable that the second claim could be allowed only upon the theory that Mr. Chadwick continued to be governor in fact after he ceased to be secretary of state.

It is significant that since the rendition of that opinion, without an exception the annotators of the Code, W. Lair Hill, C. B. Bellinger, W. W. Cotton and W. P. Lord, all men of the highest type in their profession, have construed the decision to mean that now, under the existing facts, Mr. Olcott should hold the office of governor for the remainder of the late Governor Withycombe's unexpired term. Such annotations will be found under Section 8 of Article V of the Constitution in every Code compiled and published since the rendition of that decision, which for thirty-five years has never been questioned.

Three different efforts have been made to change Section 8 of Article V of the organic law of the state: The first on November 5, 1912; the second on November 3, 1914, and the last at the special election of June 3, 1919. On the last occasion a committee composed of

Gus C. Moser, state senator, and Chris Schubel and William G. Hare, representatives, presented an argument in the voters' pamphlet in favor of the proposed amendment, saying:

"The duties of the office of governor will continue to be performed by Governor Olcott for the remainder of the term of office for which the late Governor Withycombe was elected."

To this might be added that Arizona, Utah and Wyoming are the only states in the Union which have a Constitution providing that in the event of the governor's death the secretary of state succeeds to his office or performs the duties thereof. Yet every attempt to change that section of the Constitution has been defeated by the vote of the people.

It is vigorously contended that the people should have an opportunity of choosing their own governor. They have had and exercised that right under the terms and provisions of the Constitution which three times they have refused to amend. Section 8 expressly provides that "in case of the removal of the governor from office, or of his death, * * the same shall devolve upon the secretary of state." Every voter who cast his ballot for Mr. Olcott for the office of secretary of state legally knew that under the terms of the Constitution, upon the death of Governor Withycombe, Mr. Olcott would become governor. Further, there is no provision in either statutes or Constitution for an election to fill an unexpired term of the office of governor. Such a proceeding would have to be read into the Constitution, would be based upon implied construction only, and would overrule the precedent of *Chadwick v. Earhart.*

Should the attorney general, for example, die, there would then be a vacancy in that office which could be

filled by appointment by the governor, under Section 16 of Article V of the Constitution. But when the governor dies, his office, under Section 8 of the same article, "shall devolve upon the secretary of state." That is to say, this section provides a line of succession to the office of governor; and upon the death of the incumbent the secretary of state automatically becomes governor. Upon the death of the secretary of state while in the office of governor the president of the senate becomes acting governor. There is a marked distinction between the meaning, force and effect of Section 16 and Section 8 of Article V. Under Section 16 a vacancy occurs, which the governor may fill by appointment. While the line of succession remains unbroken, as we construe Section 8, there is no such occurrence as a vacancy in the office of governor; and Sections 1 and 7 of Article V expressly provide that the term of the governor shall be four years. There is no provision by which anyone is authorized to appoint a governor. Section 8 provides a line of automatic succession; it was adopted to prevent a vacancy in the office of governor. Therein lies the distinction between the instant controversy and the cases of *State ex rel.* v. *Johns,* 3 Or. 533, and *State ex rel.* v. *Ware,* 13 Or. 380 (10 Pac. 885).

Under our Constitution the governor is the chief executive officer of the state, in whom only the power of appointment is vested, and in the very nature of things a vacancy in that office would destroy the whole plan of the state government. A governor was elected in November, 1918, and qualified in January, 1919, and one has been elected and qualified every four preceding years since the adoption of the Constitution. Under Sections 1 and 7 of Article V of the organic law the term for which a governor is elected is absolutely fixed

94 Or.—41

at four years and there is no provision in either the statutes or Constitution for the election of a governor for any portion of an unexpired term. Hence, under the terms of those sections, if a governor should be elected at the next general election, he would hold office not only for the remainder of the unexpired term of the late Governor Withycombe, but for a full four year period from January, 1921, to January, 1925. That would disarrange and destroy the whole plan of the framers of the Constitution.

2. The rule of *stare decisis* is well stated by Mr. Justice BURNETT in dissenting opinion in *Kalich* v. *Knapp*, 73 Or. 587 (145 Pac. 27, Ann. Cas. 1916E, 1051), thus:

"Another doctrine equally well settled is that of *stare decisis*, to the effect that, when a decision has once been rendered, it amounts to an authoritative construction of the law, and should not be disregarded or overturned, except for very cogent reasons showing beyond question that on principle it was wrongly decided. The principle is that laws are largely conventional rules of action, and it is more important that the rule be settled as a guiding precept to the public than that by the action of the courts the law should be made to fluctuate like the tides"; citing authorities.

And it applies with peculiar force to the decisions of courts on questions of constitutional law. The same doctrine is announced in *In re City of Seattle,* 62 Wash. 218 (113 Pac. 762), where the Supreme Court of Washington said:

"The rule of *stare decisis* is peculiarly applicable to the construction of the Constitution. The interpretation of that document should not be made dependent upon every change in the personnel of the court. When one of its clauses has been construed, that construction should not be set aside except for the most cogent reasons. Certainty in the law is of the first importance."

In *Multnomah County* v. *Sliker,* 10 Or. 65, 66, Mr. Chief Justice LORD said:

"The matter here is the constitutionality of a statute, and the rule is said to be almost universal in construing statutes and the Constitution, to adhere to the doctrine of *stare decisis.*"

In *State* v. *Frear,* 142 Wis. 320, 327 (125 N. W. 961, 964, 20 Ann. Cas. 633), the Supreme Court of that state said:

"Decisions on constitutional questions that have long been considered the settled law of the state should not be lightly set aside, although this court as presently constituted might reach a different conclusion if the proposition were an original one."

Black's Constitutional Law (3 ed.), page 81, subdivision 15, lays down the rule thus:

"The principle of *stare decisis* applies with special force to the construction of Constitutions, and an interpretation once deliberately put upon the provisions of such an instrument should not be departed from without grave reasons."

The authorities are uniform upon the force and effect of *stare decisis* in regard to a constitutional question.

In face of the decision in *Chadwick* v. *Earhart,* and with knowledge of such collateral facts, the people have always opposed any amendment to Section 8 of Article V of the Constitution. That decision was upon a constitutional question and under the facts it cannot be said that it is not sustained by reason and authority. Whatever may be our present opinions, it must now be held, under the principle of *stare decisis,* as binding upon this court. The writ is denied and the demurrer is sustained. WRIT DENIED. DEMURRER SUSTAINED.

BENNETT, J. (Specially Concurring.)—This case is fully stated in the opinion of Mr. Justice JOHNS, to which we refer.

The same questions herein presented were discussed at great length in *Olcott* v. *Hoff*, 92 Or. 462 (181 Pac. 466). These questions seem now squarely before us for decision. Every citizen is interested in who shall be governor of the state and in the enforcement of the law by which the election of a governor is submitted to the voters, at the time contemplated by the provisions of the Constitution of the state; and a *mandamus* proceeding may be maintained in a case like this at the relation of such a citizen. Otherwise, the rights of the voters could be ignored entirely, and the election of a governor postponed from time to time, at the will of the secretary of state, and there would be no remedy: *State* v. *Ware*, 13 Or. 380 (10 Pac. 885).

After much consideration and some hesitation I feel compelled to concur in the opinion of Mr. Justice JOHNS upon the ground of *stare decisis* only. It seems to me that the case of *Chadwick* v. *Earhart*, 11 Or. 389 (4 Pac. 1180), is directly in point and is controlling. If it were not for that case and if the question was here as a matter of first impression, I should be governed by the reasoning of Mr. Justice HARRIS, when the question was under consideration in *Olcott* v. *Hoff*, which seems to me to present, as a matter of logic, the stronger considerations.

The reasoning of the Chadwick case does not appeal to me as being, by any means, conclusive in its logic or even very cogent. The court in that case seems to have concluded that the relation of secretary of state to the office of governor was exactly the same as the relation of Vice-president to the office of President in the federal government. There does not seem to me

to be such analogy. The President of the United States is elected to a four year term. There is no provision in the Constitution or laws, by which in case of death or resignation his successor could be elected at any intervening time. It follows as a matter of course that the Vice-president shall take his place in case of death, and hold his office for the full remainder of the original term, because there are no means or provision by which a successor can be elected at any intervening time.

The case of governor and secretary of state under our Constitution is different. Here we have general elections every two years over the entire state, when the people may (if the Constitution is not construed to prohibit), elect a governor at the same time as the other general officers, and the members of the legislative assembly.

Neither does the reasoning of the court in that case, by which it was concluded that Section 8 of Article V of the Oregon Constitution, made the "office" of governor itself devolve upon the secretary of state and entitle the occupant of the secretary of state's office to take that office personally, and hold it after he ceases to be secretary of state, seem to me altogether satisfactory. It seems to me a better construction of the Constitution would have been, that the duties of the office, rather than the office itself, devolved upon the secretary of state, and that he exercised those duties only by virtue of his office and as long as his office of secretary of state continued. And that the office of governor itself became vacant upon the death or resignation of the governor, and could be filled at the next general election.

But we must accept some things as settled. Otherwise, there would be no end to controversy and litiga-

tion, and no one would know what his rights really are or who is entitled to administer the laws under which he lives. While not entirely satisfied with the reasoning, I find myself unable to accept the contention of the relator, that the opinion of the court in the Chadwick case was mere *dictum;* or to follow the reasoning of Mr. Justice HARRIS by which that case is distinguished from the case at bar.

It is plain there were two independent questions presented in the Chadwick case. First, whether the duties of the office of governor devolved upon the secretary of state and gave him the right to the salary of the office while he was such secretary; second, whether he continued to perform the duties of the office of governor after his office as secretary expired and during the term from which the outgoing governor had resigned; and was he therefore entitled to the salary of governor during the remainder of that term.

It is plain that what was said by the court in relation to the first question has no bearing upon this case.

If we strip the opinion down to what is strictly pertinent here it will be short and I think clear and will read as follows:

"Two questions are submitted in this case. The first and principal one is, whether, when, under Section 8 of Article V of the Constitution of Oregon, the duties of the office of governor devolve upon the secretary of state, he has a right to the salary of the office. Second. If this question be answered in the affirmative, whether he shall continue to perform the duties of the office *for the remainder of the term of the outgoing governor,* or shall he perform those duties only so long as he shall continue to be secretary of state. * *

"The principle on which the second question is to be decided, namely, whether the appellant shall cease to be governor when he ceases to be secretary of state, seems to be this: If an office be appendant, as the ex-

pression is in 1 Leon. 321, to another office, the determination of the first office will determine the second. * *

"On the contrary, if the nomination or appointment to an office be by *descriptio personarum* of one who holds some office by the title of which he is described, and who on some contingency is to enter and fill another office, the answering the description at the time the contingency arises designates him as the person who is to enter and fill the office, and when, as thus designated, he enters into the office, he holds it in his natural, and not in his official capacity. * *

"*This question, therefore, must also be answered in favor of the appellant,* and judgment be entered accordingly."

I have italicized such words in the foregoing as seem to me to be particularly pertinent.   It seems clear to me that the court by this language, intended to pass in a broad way upon the whole question, and to hold that the office of governor, which had been resigned by Governor Grover, passed to Chadwick personally, and carried with it *all the attributes of that office,* including the right to hold it for the entire remainder of the term, which unquestionably belonged to the previous outgoing governor.  If this view needs any further support than the mere language of the opinion itself already quoted, it is found in the fact that the court reached this conclusion on account of the analogy which it assumed to exist between the offices of governor of the State of Oregon and secretary of state on the one hand, and the office of President and Vice-president of the United States upon the other; and the court reasoned that the office of governor passed to the secretary of state *in the same way and for the same remainder of the term* that the office of President of the United States passes to the Vice-president.   Part of the opinion reads:

"The Constitution of the United States, providing for the contingency of a vacancy in the office of President, is nearly the same with the provisions of our state Constitution providing for a vacancy in the office of governor. * * The Vice-president holds the office of President until the successor to the deceased President comes to assume the office *at the expiration of the term* for which the deceased President and the Vice-President were elected."

We may doubt whether the supposed analogy was as complete and perfect as the court assumed, and indeed as to whether there was any analogy at all, but we cannot very well doubt that the court in the Chadwick case intended to hold that the secretary of state, held the office of governor of Oregon, in the same way that the Vice-president holds the office of President of the United States upon the decease of the President. When we remember further that the court held that the "office" devolved upon the secretary of state, and when we consider that the term "office," when used thus without limitation, has reference to the duration of the position and the term of its occupancy, as well as the duties to be performed, the purpose of the court becomes still plainer.

In *People* v. *Ahearn,* 196 N. Y. 221 (89 N. E. 930, 26 L. R. A. (N. S.) 1153), it is said in relation to the word, "office":

"It means a right * * to hold the place and perform the duty *for the term* and by the tenure prescribed by law."

In *Kendall* v. *Raybould,* 13 Utah, 226 (44 Pac. 1034), it is said:

"An office embraces the idea of tenure, *duration,* emoluments, and duty, and these ideas or elements cannot be separated and each considered abstractly. All taken together constitute the office."

To the same effect, see *Tanner* v. *Edwards,* 31 Utah, 80 (86 Pac. 765, 120 Am. St. Rep. 919, 10 Ann. Cas. 1091).

In *State* v. *Rose,* 74 Kan. 262 (86 Pac. 296, 10 Ann. Cas. 927, 6 L. R. A. (N. S.) 843), it is said:

"An 'office' is a trust conferred by public authority for a public purpose and for a definite term."

In *United States* v. *McCrory,* 91 Fed. 295 (33 C. C. A. 515), the court defines the word "office" as follows:

"An office is a public station or employment conferred by the appointment of governor, the term embracing the idea of tenure, *duration,* employment and duties."

To the same effect, see Burrell's Law Dictionary, title "Office."

In *United States* v. *Hartwell,* 6 Wall. 385 (18 L. Ed. 830), the Supreme Court of the United States says of the term "office":

"The term embraces the idea of tenure, *duration,* emolument and duties."

In *People* v. *Duane,* 121 N. Y. 375 (24 N. E. 847), it is said of a public office that it means, among other things, the right "to hold the place and perform the duty *for the term* and by the tenure prescribed by law."

It seems plain to me that the court used the word in this sense in *Chadwick* v. *Earhart,* when it said in effect that the "office" of governor devolved upon the secretary of state for the remainder of the governor's term, and that it intended to place its decision upon the broad principle, that the office of governor, with all its attributes, including the duration of the term, devolved upon the person who was then secretary of state, who continued to hold it for the entire remainder

of the term, the same as the Vice-president holds the office of President.

It remains to be considered, whether or not the question which the court did decide and which it intended' to decide, in the case of *Chadwick* v. *Earhart,* and especially the question as to whether or not the secretary of state took the office personally and held the office of governor for the entire term, or only a portion thereof, was fairly within the issues made in that case, or whether, on the other hand, the principles that the court announced in that case were outside of the issues and mere *dictum,* which settled nothing and binds nobody.

In considering this question we must, it seems to me, remember that this is a great constitutional question in which the whole people of the state are deeply interested. They are interested to know, now and at all times hereafter, who is in truth their governor, and who is entitled to administer their laws. And when that question had once been settled they are interested in having that settlement remain undisturbed. It is far more important that the people shall know for a certainty who is of right their governor at a given time, and who is entitled to perform the duties of the highest office of the state, than it is that any one person shall be governor at a given period.

It is not so very important to the people of the State of Oregon, whether Mr. Olcott or some other competent person shall act as governor for the ensuing two years. But it is important—exceedingly important— that whoever does act as governor shall have undoubted and unquestioned authority—so that his acts may be valid and the people may know them to be valid, and that their validity is beyond doubt or cavil. We do not want any possibility of two governors in the

state; or two persons claiming to be governor, each with some shadow of authority and with a divided fealty behind him. It is because of such possibilities, no doubt, that the authorities recognize that the doctrine of *stare decisis* rests with peculiar and exceptional force, upon such great constitutional questions.

Mr. Black, in his work on Judicial Precedents, page 222, says:

"The principle of *stare decisis* applies with especial force to the construction of Constitutions, and an interpretation once deliberately put upon the provisions of such an instrument, should not be departed from without grave reasons."

And at another place, on page 223:

"Former decisions should not be departed from merely because the court, as at present constituted, entertains a different opinion as to the meaning or application of a given provision of the Constitution from that announced by its predecessors."

And again, on page 224:

"It is said that the principle of *stare decisis,* as applied to the construction and interpretation of the Constitution, is specially imperative, when the former decisions were rendered at an early day and have long been considered as settling the law."

In Lewis' Sutherland on Stat. Const. (2 ed.), Section 475, it is said:

"When a judicial interpretation has once been put upon a clause, expressed in a vague manner and difficult to be understood, that ought of itself to be sufficient authority for adopting the same construction."

It is true that questions not fairly within the issue made by the pleadings and presented to the court, cannot be authoritatively passed upon in any case, and if the court goes outside of these questions and decides

others which are not before it, its utterance is a mere *dictum* which binds no one; and we must always assume that the court only intended to pass upon the questions that were really presented in any case for decision. But I do not understand, that in order to make the decision in one case a controlling precedent in another, the two cases must be in all respects exactly identical. On the other hand, as I understand the rule, if the doctrines announced in one case are necessary to the decision—necessary to the conclusion which the court reached in that case, and a part of the reasoning upon which the court reached that conclusion, they become established principles which govern all other cases, which come within them.

"Whenever a question fairly arises in the course of a trial, and there is a distinct decision thereon, the courts ruling in relation thereto, can in no sense be regarded as mere *dictum*": *Railroad Co.* v. *Price,* 159 Fed. 332 (86 C. C. A. 504, 16 L. R. A. (N. S.) 1103).

"No matter what the situation may appear to be, as to the unjust operation of a law, courts should, not struggle to change it as it has been understood to exist and has been plainly written into its decisions for years, by fine distinctions between cases, and by rejecting the reasons upon which they were grounded as *obiter*": Lewis' Sutherland on Stat. Const. (2 ed.), § 484.

"A judicial decision is to be regarded as conclusive, not only of the point presented in argument, but of every other proposition necessarily involved in reaching the conclusion expressed": Id., § 486.

Our own court has gone further than most courts—further than it has seemed to me sometimes it ought to go—in extending the doctrine of *stare decisis.* In the case of *Wilcox* v. *Warren Construction Co.,* 95 Or. — (186 Pac. 13), decided at this term, the majority of the court held that a previous decision that a mother took

to the exclusion of a father under the employers' liability law, upon the death of a child, was controlling as to the relative right of the widow and children under the same law on the death of the husband and father, although the court in the previous decision had not even attempted to decide the rights of the latter in any way, and there was a very broad ground for distinguishing between the two.

In *Olcott* v. *Hoff*, already cited, the majority of the court held that an authoritative and controlling decision could be made, as to how long and for what term the secretary of state could hold the office of governor; and even as to whether he could resign the office of secretary of state and still hold the office of governor, although neither of these questions were at all presented in the pleadings, and the only question really at issue, was whether or not the state treasurer should have honored a warrant drawn for his salary, while he was still secretary of state, and while the office of governor was still unquestionably vacant except for his incumbency. In that case Mr. Justice HARRIS, in an opinion in which Mr. Justice BENSON concurs, says:

"We can with propriety discuss and *determine* the question as to how long Ben W. Olcott is entitled to hold the office of governor and thus decide the rights of the petitioner upon the one hand and the duties of the defendant on the other."

And that—

"The petitioner can resign as secretary of state and continue to occupy the office of governor."

If a decision, as between the rights of the mother and father to damages under the liability law, is to be held conclusive and controlling between the widow and children, whose rights were in no way in question, and if

we could properly determine the right of the secretary of state to resign and still hold the office of governor, and the right of the secretary of state to hold the office of governor after the election in 1920 in *Olcott* v. *Hoff*, when these questions were in no way presented by the pleadings, then it seems to me, that it would be going a long way to hold that we are not bound, by the unanimous decision of a previous Supreme Court, when it was passing properly and necessarily upon the very question as to whether such secretary of state, acting as governor, held for the full remainder of the governor's term or only a portion of that remainder.

It seems to me the holding of the court in the Chadwick case, that the office of governor devolved upon the secretary of state for the full term of the outgoing governor, carrying with it all the attributes of that office in the hands of him who had resigned, including the duration of the term, was necessary to that decision; and indeed was the very foundation upon which the decision was based. That being true, it follows that we must so hold in this case unless we are ready to overrule the Chadwick decision and disturb again what was once settled thereby, because our own individual judgments—or the individual judgment of the majority of us—differs from the judgment of the preceding tribunal. This I am not willing to do.

How can anything in relation to these great constitutional matters, be settled, if one court does not follow the precedent of another? How can we expect other courts in the future to follow our decisions if we ourselves refuse to follow the decisions of those who have gone before? If we overthrow the decision in the Chadwick case because some of us now believe that the Constitution should have been differently construed, there is nothing settled—nothing determined. The

next court coming after us will find two decisions of this
court in direct conflict. One a unanimous decision by
a full court, holding directly that the secretary of state
holds for the entire term of the governor and our de-
cision by a divided court to the contrary. Which de-
cision would the succeeding court be bound to follow,
or would it be bound to follow either. The whole ques-
tion will be thrown into chaos and no one, under such
conditions, would know who would be really governor.
Since the Chadwick case was decided I think it has
been universally accepted as settling the question.

As is shown in the opinion of Mr. Justice JOHNS, the
different codifiers of our laws—all of them learned
lawyers—since that time, have embodied in every codi-
fication a note to this section of the Constitution, an-
nouncing that the secretary under such conditions holds
over during the entire term. No lawyer could open
his Code to the Constitution without having it staring
him in the face. It has stood thus for 35 years. The
decision of the Chadwick case is a part of the early
history of the state. Since that decision, young men
have grown old. Children have been born and married
and died. An entire generation has passed away.
Since then seventeen legislatures have held their
biennial sessions. They have not even submitted an
amendment changing the Constitution as thus con-
strued. For many years now the people have had the
opportunity to change their own Constitution by the
initiative. No change in this regard has been made or
even offered.

May we not assume fairly, that the people and the
legislature have been satisfied with the Constitution as
it was considered in the Chadwick case? It is true
that our system of filling our offices is generally by elec-
tion rather than by appointment. But when the sec-

retary of state takes the office of governor he takes it
in some sense by election.   The people, when they elect
a secretary of state, know that in case of the death or
resignation of the governor, he will become the incum-
bent of that office.   Since the decision in the Chadwick
case, we must suppose that the people knew and ac-
cepted the fact that he would become governor for the
entire remainder of the governor's term.   When they
elect a secretary of state they may fairly be presumed
to have elected him for that purpose and with these
things in view; and we may assume that he is their
choice to fill that position in case of the death or
resignation of the governor.   Of course if there is no
vacancy—if the office of governor is already filled, by
an incumbent who has the right to hold the office for
the entire term for which Governor Withycombe was
elected—then there is no governor now to be elected.
and the petition of the relator must be denied.   I can-
not see any escape from this result.

HARRIS, J. (Dissenting.)—The relator contends
that the legal voters of Oregon have the right to elect
a governor at the regular biennial election to be held
in November, 1920; while it is argued, in behalf of the
defendant, that Ben W. Olcott who is now occupying
the office of governor is entitled to continue to perform
the duties of governor until January, 1923.   The ques-
tion for decision has received the careful consideration
of all the members of the court, but with the result,
however, that all do not reach the same conclusion.   A
majority of the court are of the opinion that the legal
voters of the state cannot choose a governor until the
biennial election occurring in 1922 and that Ben W.
Olcott can occupy the office of governor until January,
1923, notwithstanding the fact that his term as secre-

tary of state will expire on the first Monday in January, 1921, and in despite of the fact that a regular biennial election will be held throughout the state in November, 1920. I dissent from the conclusion reached by a majority of my associates; for I am of the opinion that under the Constitution of this state the people have a right to elect a governor at the next election. Although I expressed my views upon the subject at some length in *Olcott* v. *Hoff*, 92 Or. 462 (181 Pac. 466); yet I think that the arguments advanced in the instant proceeding warrant a re-statement of some of the facts narrated in *Olcott* v. *Hoff* and justify an amplification of some phases of the subject there considered.

It is argued that the question to be decided in this case was determined in the case of *Chadwick* v. *Earhart,* 11 Or. 389 (4 Pac. 1180), and that consequently the doctrine of *stare decisis* is applicable. The case of *Chadwick* v. *Earhart* occupies an important place in this controversy. Mr. Justice BENNETT expressly bases his conclusion upon *Chadwick* v. *Earhart* and says that, were it not for the Chadwick case, he would come to a different conclusion. An analysis of the opinion written by Mr. Justice JOHNS will show that the case of *Chadwick* v. *Earhart* is taken as the sole foundation and then upon it as such foundation is laid the whole argument for the conclusion finally reached. This is equivalent to saying that because, and only because, of what was decided in *Chadwick* v. *Earhart* it is now here decided that Ben W. Olcott is entitled to serve as governor until the expiration of the term for which James Withycombe was elected. If this is a correct statement then it is accurate also to say that a majority of the court would hold that a governor

94 Or. —42

could be elected in November, 1920, were it not for the decision rendered in the Chadwick case.

If the case of *Chadwick* v. *Earhart* had never been brought and if the questions necessarily decided in that case were now for the first time presented I would, for reasons which to me appear to be not only persuasive but also convincing, construe Article V, Section 8 of the Constitution differently in some respects from the interpretation expressed in *Chadwick* v. *Earhart;* but since *Chadwick* v. *Earhart* was prosecuted to a final decision in this court I think that under the rule of *stare decisis* this court ought to be bound by that decision to whatever extent, but no further than, it was necessary for the court to go in order to dispose of the controversy there presented.

We can all agree that the doctrine of *stare decisis* is a firmly established rule and that it is peculiarly applicable to controversies involving the construction of any given section of the state Constitution. But we cannot all agree that the doctrine of *stare decisis* applies here. That we may see, if possible, whether this doctrine is properly applicable to the case in hand let us ask: What is this rule of *stare decisis?* When can we say that the doctrine is applicable, And is this case which is now presented to us for decision properly governed by the rule? As the writer views the facts, the situation presented in *Chadwick* v. *Earhart* is essentially different from the situation presented here. As the writer reads the records, it was not necessary for the court to decide in *Chadwick* v. *Earhart* and the court did not decide that the secretary of state could hold the office of governor under the provisions of Article V, Section 8 of the Constitution through two regular biennial state elections. In the opinion of the writer an analysis of the facts in *Chadwick* v. *Earhart,*

when made and compared with the facts presented here, will show plainly that the two situations are essentially different. and that the doctrine of *stare decisis* has no application whatever to the present controversy.

Expressed in plain English the doctrine of *stare decisis* means: To stand by precedents, and not to disturb settled points; a point once decided ought to stand as settled and should not be disturbed. In other words, stated in general terms, but subject to the limitations yet to be noticed, whatever points were necessary to be decided in *Chadwick* v. *Earhart* in order to reach the final conclusion there expressed should be considered as settled and ought not to be disturbed.

The rule of *stare decisis* is not a loose generality; but it is circumscribed and confined within well-established limits. In *Hough* v. *Porter,* 51 Or. 318, 410 (95 Pac. 732, 98 Pac. 1083, 1099), this court said:

"It is well settled that no case can be deemed a precedent binding upon the court unless the point in question was there presented or considered."

The following terse statement appears in *Johnson* v. *Bailey,* 17 Colo. 59 (28 Pac. 81):

"It is not every remark in a judicial opinion that amounts to a judicial decision."

See, also: *People ex rel.* v. *State Board of Tax Commissioners,* 174 N. Y. 417 (67 N. E. 69, 105 Am. St. Rep. 674, 63 L. R. A. 884, 898); *McAdams* v. *Bailey,* 169 Ind. 518 (82 N. E. 1057, 124 Am. St. Rep. 240, 13 L. R. A. (N. S.) 1003, 1009).

In *Cohens* v. *Virginia,* 6 Wheat. 264, 399 (5 L. Ed. 257), Chief Justice MARSHALL used the following language which has been repeatedly quoted with approval by text-writers and jurists:

"It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

In *Larzelere* v. *Starkweather*, 38 Mich. 96, 101, the court used the following *apropos* language:

"In the preparation of an opinion, the facts of the case are in mind. It is prepared with reference to such facts, and when considered in connection therewith, will generally be found satisfactory. When, however, an attempt is made to pick out particular parts or sentences, and apply them indiscriminately in other cases, nothing but confusion and disaster will be likely to follow. In other words, the opinion and decision of a court must be read and examined as a whole in the light of the facts upon which it was based. They are the foundation of the entire structure which cannot with safety be used without reference to them."

This principle was invoked by Mr. Justice BENNETT when dissenting from the majority opinion in the recent case of *Wilcox* v. *Warren Construction Co.;* for we quote from his dissenting opinion as follows:

"However, as the question of preference between the widow and the orphan children was not before the court in that case (referring to a prior adjudication) and there is much ground for distinction between the priority of the mother and father on the one hand and those of the widow and children upon the other, *we must according to recognized principles, assume that the*

*court only intended to pass upon the question that was really presented in the case for decision, and that its language is limited to that question."*

In the historic case of *Ogden* v. *Saunders,* 12 Wheat. 212, 332 (6 L. Ed. 606), it was contended that the opinion rendered in the prior case of *Sturges* v. *Crowninshield,* 4 Wheat. 122 (4 L. Ed. 529), was controlling; but this contention was answered by Chief Justice MARSHALL who in the course of his justly celebrated opinion wrote as follows:

"But that decision (*Sturges* v. *Crowninshield*) is not supposed to be a precedent for *Ogden* v. *Saunders,* because the two cases differ from each other in a material fact; and it is a general rule, expressly recognized by the court in *Sturges* v. *Crowninshield,* that the positive authority of a decision is coextensive only with the facts on which it is made."

Remembering that "it is not every remark in a judicial opinion that amounts to a judicial decision," that "general expressions in every opinion are to be taken in connection with the case in which those expressions are used," that the opinion in a "former case must be construed with reference to the particular facts in that case," that "we must, according to recognized principles, assume that the court only intended to pass upon the question that was really presented in the case for decision, and that its language is limited to that question," and that "the positive authority of a decision is coextensive only with the facts on which it is made," and with these fundamental rules constantly in mind, let us now narrate the material facts presented in *Chadwick* v. *Earhart* and then let us state the facts presented in the instant controversy, and after so doing, let us then compare the two situations and as-

certain, if we can, whether the doctrine of *stare decisis* can be invoked by the defendant.

L. F. Grover was elected governor at the June, 1874, election for the full term of four years; and at the same time Stephen F. Chadwick was elected secretary of state for a like term. The Constitution has always provided that the returns of every election for governor shall be sealed up and directed to the speaker of the house of representatives who shall open and publish them in the presence of both houses of the legislative assembly; and in 1878, as now, the law also provided that the term of office of the governor ceases when his successor, having been declared elected by the legislative assembly as provided in the Constitution, shall be inaugurated by taking the oath of office. Prior to 1908, the law provided that the term of office of secretary of state, state treasurer and state printer "shall cease on the first day of the regular session of the legislative assembly next following the general election on which the terms of their successors shall begin": Deady's Code, p. 711; Section 3441, L. O. L. Prior to 1885, the biennial sessions of the legislative assembly began on the second Monday in September in the even-numbered years, but commencing with 1885 the sessions have begun on the second Monday in January in the odd-numbered years. The legislative assembly of 1876 elected L. F. Grover United States senator; and on February 1, 1877, Grover resigned as governor so that he could assume the duties of United States senator. W. W. Thayer was elected governor at the June, 1878, election, and at the same time R. P. Earhart was elected secretary of state. The legislative session which was held in 1878 convened on the ninth day of September. The speaker of the house of representatives having published the returns of the

election for governor in the presence of both houses of the legislative assembly, W. W. Thayer took the oath of office on September 11, 1878. Thus it is seen that the term for which Grover was elected governor began in September, 1874, and ended on September 11, 1878; and it is likewise seen that the term for which Chadwick was elected secretary of state began in September, 1874, and ended on September 9, 1878, and Earhart's term as secretary of state began simultaneously with the ending of Chadwick's term as secretary of state. Chadwick performed the duties of secretary of state during his entire term as such officer and in addition to performing the duties of that office he also discharged the duties of governor from February 1, 1877, the date of Grover's resignation, until September 11, 1878, the date of Thayer's inauguration as governor. Chadwick demanded of Earhart as secretary of state a warrant for $2,420.75 covering the salary of governor for the period commencing February 1, 1877, and ending September 11, 1878. Upon the refusal of Earhart to issue the warrant, Chadwick began a proceeding for the purpose of compelling Earhart to issue a warrant for the full amount demanded. The parties submitted the case to the court upon an agreed statement of facts; and, among other things, the parties agreed as follows:

"Mr. Earhart objects to the salary being paid from the ninth day of September, 1878, to the eleventh day of September, 1878—two days—on the ground that Mr. Chadwick was not secretary of state after Mr. Earhart was sworn in on the ninth day of September, 1878, though Mr. Chadwick acted as governor or until and including the eleventh day of September, 1878."

We also find in the agreed statement of facts the following:

"That on the first of February, 1877, the said Stephen F. Chadwick being the secretary of state as

aforesaid duly qualified as governor of the State of
Oregon and thereafter discharged the duties of said
office of Governor of the State of Oregon during *the
remainder of the unexpired term of the said L. F.
Grover. * * "*

The language already quoted makes it plain that
Earhart conceded that Chadwick was entitled to the
salary of governor from January 1, 1877, to and in-
cluding September 9, 1878, but that he denied and was
only contesting the right of Chadwick to draw the gov-
ernor's pay for September 10th and 11th, two days,
on the ground that the right of Chadwick to perform
the duties of governor ended with the end of his term
as secretary of state. If, however, we assume for the
purposes of the discussion that the pay for those two
days was not the only point in controversy, yet all will
no doubt admit that it was the main point presented
for decision, for we find the parties saying in their
agreed statement of facts that "Mr. Earhart objects
to the salary being paid from the ninth day of Sep-
tember, 1878, to the eleventh day of September, 1878—
two days—on the ground that Mr. Chadwick was not
secretary of state after September 9th."

The instant case presents an entirely different state
of facts. Ben W. Olcott was re-elected secretary of
state at the 1916 election and his term of four years
as such officer will expire on the first Monday in Janu-
ary, 1921. James Withycombe was re-elected gov-
ernor at the November, 1918, election, and if he had
lived to complete his term of four years his incum-
bency would not end until 1923. But James Withy-.
combe died on March 3, 1919; and since that time Ben
W. Olcott has been discharging the duties of governor.

Having stated the essential facts involved in the two
cases let us now compare them and ascertain whether

the doctrine of *stare decisis* has any application.  In the Chadwick case there was an unexpired term and it was referred to by the parties in their agreed statement of facts as the "remainder" of Grover's term; and naturally the court, when passing upon the case used the language of the parties and referred to the only unexpired term then being considered as the "remainder" of the term.  In the instant case there is also an unexpired term and therefore a "remainder." But the "remainder" in one case is essentially different from the "remainder" in the other case.  Grover served through the first election occurring after his inauguration, but Withycombe did not.  The "remainder" in the Chadwick case covered a period embracing only one election; the "remainder" in the instant case covers a period embracing two elections.  During the "remainder" mentioned in the Chadwick case an election occurred and at that election a governor was elected.  In the Chadwick case the question as to whether a governor could be elected was not and could not have been decided, because a governor was in truth elected.  In the instant case no governor has yet been elected and the very question in dispute and the only question to be decided is whether a governor can be elected.  The question as to whether or not Chadwick could have held through two elections and until 1878 if Grover had resigned on February 1, 1876, instead of February 1, 1877, was not involved in the Chadwick case; the court neither decided nor attempted to decide that question; and indeed, any attempt to decide that question would have been the purest *obiter dictum.*  Since then the question of whether or not the people could elect a governor "was not before the court" in the Chadwick case, is it not manifest that the doctrine of *stare decisis* has no application what-

ever to the instant case, where the only question for
decision is whether the people can elect a governor?
And since the "remainder" spoken of in the Chadwick
case is so widely, so materially and so inherently dif-
ferent from the instant case and since in the Chadwick
case the question which the court was called upon to
decide was so utterly different from the question now
presented for decision, is it not clear that "we must,"
again borrowing language used in *Wilcox* v. *Warren
Construction Co.,* "according to recognized principles,
assume that the court only intended to pass upon the
question that was really presented in the case for deci-
sion, and that its language is limited to that question?"

If the legal voters are permitted to elect a governor
at the November, 1920, election, the person so elected
could not take the oath of office until the speaker of the
house first publishes the returns of the election in the
presence of the two houses of the legislative assembly.
A secretary of state will be elected in November, 1920,
to succeed Ben W. Olcott as secretary of state, and the
person so elected will assume the duties of the office on
the first Monday in January, 1921; but by virtue of the
ruling in the Chadwick case Ben W. Olcott would con-
tinue to occupy the office of governor not only until
the first Monday in January, 1921, but also until the
legislative assembly convenes in 1921 and the speaker
of the house publishes the election returns and the
elected governor takes the oath of office. The Chad-
wick case is authority for holding that Ben W. Olcott
is entitled to the salary of governor so long as he dis-
charges the duties of governor. The Chadwick case
is authority for holding that Ben W. Olcott is entitled
to occupy the office of governor until some person is
elected and qualifies for the office. But the Chadwick
case does not decide when a governor can be elected.

In the Chadwick case a governor had in truth been
elected. The election of a governor was an accom-
plished fact. There was no occasion to decide or to
attempt to decide whether a governor could be elected.
The most that can be said for the Chadwick case is
that it decided that Chadwick was entitled to occupy
the office of governor until Thayer who had been
elected, was sworn in and assumed the duties of the
office.

The single question here for decision is whether the
legal voters have a right to elect a governor at the next
election. If the holding in the Chadwick case does not,
when measured by the rules governing the doctrine of
*stare decisis,* decide that question, then we must look
to the Constitution itself for an answer; and if the lan-
guage of that instrument does not solve the problem,
then the question must be determined by general legal
principles governing vacancies in elective offices.

Article V, Section 8, of the Constitution reads as
follows:

"In case of the removal of the governor from office,
or of his death, resignation, or inability to discharge
the duties of the office, the same shall devolve on the
secretary of state; and in case of the removal from
office, death, resignation, or inability, both of the gov-
ernor and secretary of state, the president of the sen-
ate shall act as governor, until the disability be re-
moved, or a governor be elected."

Article XV, Section 1, provides that:

"All officers, except members of the legislative as-
sembly, shall hold their office until their successors are
elected and qualified."

Under the terms of these sections of the Constitution
Ben W. Olcott can hold the office of governor until a
*governor* is elected and has qualified; but these sections

do not tell us when that governor, who is to be elected, can be elected; nor does any other section of the Constitution contain language which alone and in express terms tells us that the governor, who is to be elected, shall be elected in 1920 or in 1922.

It is contended, however, in behalf of defendant that Article V, Section 8, takes the office of governor out of the general rule which regulates other offices, and that the office of governor is an exception to the general rule. The argument is that there never had been a vacancy in the office of governor. This argument proceeds on the theory that when the people elected Ben W. Olcott as secretary of state they also at the same time elected him governor, and that therefore when James Withycombe died and Ben W. Olcott assumed the office of governor he became an elected rather than an appointed governor; and that Olcott's accession to the governorship was contemporaneous with Withycombe's decession, so that there was not in fact any vacancy in the office of governor. This argument that Ben W. Olcott is an elected governor is answered by other sections of the Constitution. Article V, Section 1, of the Constitution provides that the governor shall hold his office for the term of four years and that "no person shall be eligible to such office more than eight years in any period of twelve years"; but it is also provided in Article II, Section 12, that "in all cases in which it is provided that an office shall not be filled by the same person more than a certain number of years continuously, an appointment *pro tempore* shall not be reckoned a part of that time." The mere reading of these provisions of the Constitution makes it plain that Ben W. Olcott is now serving under an appointment within the meaning of Article II, Section 12, and that the time so served is not to be counted as a part of the

eight years period mentioned in Article V, Section 1. The Constitution appoints the secretary of state as the person to fill the office of governor in the event the latter office becomes vacant by death or otherwise, while vacancies in other offices are filled by appointments made by the governor himself. The appointment of the secretary of state as the person to fill the office of governor is automatic and is made by force of the terms of the Constitution; but it is none the less an appointment.

It is further argued that there has been no vacancy in the office of governor. Matthew P. Deady, who was president of the convention that prepared the very Constitution which we are now considering, evidently construed Article V, Section 8, to refer to a vacancy in the office of governor, for in the Code compiled by Deady and Lane in 1874 they gave to Article V, Section 8, a marginal heading as follows: "In case of vacancy or disability"; and it may be noted that this same marginal heading appears in every Code that has been issued since that time. A vacancy in the office of governor is filled by an appointment and so too is a vacancy in the office of secretary of state filled by an appointment. In the one case the appointment is by the Constitution; in the other case it is by the governor. In the one case the person who is to be appointed is described by the Constitution; in the other case the person is not described and the governor is permitted to name whomsoever he chooses. In the one case the appointment is made instantly; in the other case some delay is unavoidably necessary and yet in both instances the appointment is mandatory, for even where the governor fills a vacancy by appointment he "shall," not "may," fill the vacancy by appointment. But in the final analysis there has been an appointment in

both cases; and in both cases the appointment is made to fill a vacancy, for without a vacancy there would be no appointment. The very fact of an appointment presupposes a vacancy. The circumstance that the appointment was instantaneous does not alter the situation. Frank W. Benson was elected secretary of state in 1910 but he died on April 14, 1911. Ben W. Olcott was appointed secretary of state on April 17, 1911, so that there was an actual vacancy from April 14th until April 17th. And in passing we may add that Ben W. Olcott did not take the oath of office as governor until March 7, 1919, although James Withycombe died on March 3, 1919. In 1912 Ben W. Olcott was elected secretary of state. At the very moment when the election was being held in 1912 the office of secretary of state was occupied and filled by Ben W. Olcott; and yet it is accurate to say that Ben W. Olcott, when elected in 1912, was elected to fill a vacancy caused by the death of Frank W. Benson. And so, too, if a governor is elected in 1920 he will be elected to fill a vacancy caused by the death of James Withycombe in exactly the same sense as in the case where Ben W. Olcott was elected to fill a vacancy in the office of secretary of state.

As the writer reads and construes the Constitution the right of the voters to elect a governor is the same as and no different from the right of the voters to elect a secretary of state in the event a vacancy occurs in the latter office by death, resignation or otherwise. If, in this respect, the office of governor is subject to the same rule as the office of secretary of state, then regardless of whatever the rule may be in the other jurisdictions we are controlled by precedents in this state holding that a vacancy in an elective office, in the absence of an organic or statutory law to the contrary,

causes the office to revert to the people, the source from whence it came, again to be filled by them. This branch of the case need not be elaborated further, for it is fully discussed in the precedents relied upon in *State ex rel.* v. *Kellaher,* 90 Or. 538 (177 Pac. 944).

The principle that the death, resignation or removal of an elected officer leaves a vacancy and that such vacancy, in the absence of express legislation to the contrary, shall be filled by the legal voters at the very next regular election, if there be sufficient time, has been recognized and invariably followed and applied during an unbroken period of 49 years, beginning with *State ex rel.* v. *Johns,* 3 Or. 533, decided in 1870, and ending with the recent case of *State ex rel.* v. *Kellaher,* 90 Or. 538 (177 Pac. 944). In *State ex rel.* v. *Johns,* a county judge was elected in June, 1866, for a term of four years. He qualified in July, 1866, but died in September of that year. The governor appointed a person to fill the office, but at the June, 1868, election, not the June, 1870, election, a successor was elected. In *Baker* v. *Payne,* 22 Or. 335 (29 Pac. 787), the legislative assembly of 1891 created the office of attorney general and provided that an attorney general "shall be elected" at the general election held in June, 1894, for the term of four years and "until his successor is elected and qualified." A separate section of the act provided that in case of a vacancy in the office the governor "shall" appoint a suitable person who "shall" hold the office until the next general election when his successor shall be elected and shall qualify. The act also made it the duty of the governor to appoint some person as attorney general as soon as the act became effective; and accordingly on May 21, 1891, the governor appointed an attorney general. The question involved was whether the appointed attorney general

held until the election of 1894 or whether an attorney
general could be elected in 1892 to serve until 1894, at
which latter time an attorney general was to be elected
for a term of four years; and yet, notwithstanding the
fact that there was ample reason for holding that the
legislature intended that the appointed attorney gen-
eral should hold the office until 1894, the principle of
the right at the very next election to fill a vacancy in
an elective office by an election was decreed to be so
thoroughly established that it was held that an attor-
ney general could be elected in 1892.

The principle was strictly followed when the death
of Frank W. Benson caused a vacancy in the office of
secretary of state. Frank W. Benson was elected sec-
retary of state at the 1910 election for a term of four
years; and he died in April, 1911. Had he lived and
served through his full term he would have occupied
the office through two elections, one in 1912 and an-
other in 1914. After the death of Benson the governor
appointed Ben W. Olcott on April 17, 1911. The ap-
pointee did not serve as appointee merely through the
next ensuing election and until the second election, but
upon the contrary at the very first election after the
death of Benson the people voted for a secretary of
state and selected Mr. Olcott and then in 1916 he was
re-elected to the office. Thus it is seen that the invari-
able practice, sanctioned and enforced by this court
and followed by the voters, has been to fill a vacancy
at the first election.

The provisions in the federal Constitution relating
to the President and Vice-president do not furnish any
analogy to the provisions of our state Constitution re-
lating to the governor and secretary of state. The
federal Constitution provides that the President and
Vice-president shall be elected "together" for "the

term of four years'' and consequently upon the death of the President, the Vice-president occupies the office of President until the end of four years and a President cannot be elected before that time as the President, when elected, must be elected ''together'' with a Vice-president. A governor was not elected in 1912 when Ben W. Olcott was elected secretary of state; nor was a governor elected in 1916 when Ben W. Olcott was re-elected secretary of state. If the governor and the secretary of state must be elected ''together,'' then the people had no right to elect a secretary of state in 1912 nor in 1916, with the result that Ben W. Olcott has been holding the office of secretary of state merely as an appointee since April, 1911, and has at no time been an elected officer. Under the terms of the federal Constitution a President cannot be elected at all unless he is elected ''together'' with a Vice-president. No such language appears in our state Constitution.

The reasons for my dissent given in *Olcott* v. *Hoff* and assigned herein may be summarized thus: If *Chadwick* v. *Earhart* had never been decided and if Article V, Section 8, of the Constitution had never been previously considered by the court I would take the view that Ben W. Olcott could discharge the duties of the office of governor only until the end of his term as secretary of state, which will occur on the first Monday in January, 1921, and that whoever is elected secretary of state in November, 1920, would on the first Monday in January, 1921, assume the duties of governor and discharge them during the few days which would intervene between the first Monday in January and the day when the speaker of the house publishes the election returns for the office of governor; but since it was decided in *Chadwick* v. *Earhart* that Chadwick

94 Or. —43

could hold the office of governor until an elected governor could be inaugurated, it follows that Ben W. Olcott can hold the office of governor not only until the first Monday in January, 1921, the date when his term as secretary of state expires, but also until such time as an elected governor can take the oath of office and assume the duties of the position. The case of *Chadwick* v. *Earhart* does not afford any foundation for the doctrine of *stare decisis* and the instant case is not governed by the rule of *stare decisis*. The governing facts in the Chadwick case are materially different from the controlling facts in the instant case. In the Chadwick case, the only question for decision was whether Chadwick, who had been elected secretary of state, could hold the office of governor during the brief period of two days which intervened between the end of his term as secretary of state and the inauguration of an elected governor. Here the question is whether Ben W. Olcott, whose term as secretary of state will end on the first Monday in January, 1921, can hold the office of governor for a period of two years after the end of his term as secretary of state, in spite of the fact that there will be a regular biennial election in November, 1920, as well as one in November, 1922; there a governor had in truth been elected, while here no governor has yet been elected; there the only question which was decided was that the secretary of state could hold the office of governor until an elected governor could be inaugurated, while here it is conceded that the secretary of state can hold the office of governor until an elected governor can be inaugurated; there a governor was elected at the very first election occurring after the office of governor became vacant, while here no governor has yet been elected, and the only question to be decided is whether a governor can

be elected; there the court was not called upon to decide when a governor could be elected, while here that is the sole question for decision.   Since the Chadwick case does not decide or attempt to decide when a governor can be elected, our investigation and decision of the question presented here is unhampered and uncontrolled by any prior adjudication; and therefore we must first look to the Constitution itself and see whether it tells us when the governor is to be elected. Upon turning to that instrument we find that Article V, Section 4, tells us that "the governor shall be elected by the qualified electors of the state at the times and places of choosing members of the legislative assembly"; and upon further investigation we find that November, 1920, is the time when and the voting places throughout the state are the places where the qualified electors of the state will choose members of the legislative assembly.   The Constitution does not state in express terms, nor does it impliedly say, that a governor cannot be elected at the next election; and therefore we must, on that account, ascertain what the general rules of law are.   The rule in this jurisdiction has always been that when an elective office becomes vacant the legal voters have the right in the absence of a statute to the contrary, at the next election, if there be sufficient time to make use of the election machinery, to elect some person to the office.   This rule has been enforced by this court in previous cases; and it has been observed by the voters, notably when Ben W. Olcott was elected secretary of state to fill a vacancy caused by the death of Frank W. Benson.   Applying the general rule which governs elective offices we are then brought to the conclusion that the legal voters are entitled to elect a governor in November, 1920.

For the reasons which I expressed in *Olcott* v. *Hoff* and for those given herein I am unable to agree with the conclusion reached by a majority of my associates.

BENSON, J., concurs.

BURNETT, J.—I concur in the argument of 'Mr. Justice HARRIS in his limitation of *Chadwick* v. *Earhart,* and likewise I concur in the result of his opinion.

If the present secretary of state is now indeed the governor, he can resign the latter office. Such a resignation would not affect the duties imposed upon a governor, for there would still be in office the present elected, qualified and acting secretary of state, who is charged by the Constitution with the performance of those duties until a governor shall be elected. The secretary of state's tenure of office as such is the utmost limit of his authority to discharge the duties of the governor's office. It is further limited by the right of the people to choose their governor at the first opportunity afforded by a general election. The secretary of state has no other or additional hold on the gubernatorial office. It is only because he is secretary that he can perform the duties of governor.

Election is the rule and appointment is the exception in filling vacancies in constitutional offices. The exception ought not to be expanded by construction so as to narrow the rule. For these reasons I am of the opinion that the people are entitled to elect a governor at the next general election and that the writ should be made peremptory.